MARCUS CABLE ASSOCIATES, L.P.
d/b/a Charter Communications,
Inc., Petitioner,

v.

Alan and Myrna KROHN, Respondents.

No. 01–0291.

Supreme Court of Texas.

Argued Feb. 20, 2002.

Delivered Nov. 5, 2002.

Bob E. Shannon, William Paul Johnson, Baker & Botts, Austin, Samara L. Kline, Baker & Botts, Dallas, and Joe R. Greenhill, Baker & Botts, Austin, Linda Reisner, for Petitioner.

Brett L. Bigham, Waxahachie, for Respondents.

Justice O'NEILL delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice ENOCH, Justice OWEN, Justice HANKINSON, Justice JEFFERSON, Justice RODRIGUEZ, and Justice SCHNEIDER joined.

In this case, we must decide whether an easement that permits its holder to use private property for the purpose of constructing and maintaining "an electric transmission or distribution line or system" allows the easement to be used for cable-television lines. We hold that it does not. We further hold that section 181.102 of the Texas Utilities Code, which grants cable companies the right to install lines on a "utility easement," does not apply to private easements like the one at issue here. Accordingly, we affirm the court of appeals' judgment reversing summary judgment in the cable company's favor. 43 S.W.3d 577.

## I. Background

This case centers around the scope of a property interest granted over sixty years ago. In 1939, Alan and Myrna Krohn's predecessors in interest granted to the Hill County Electric Cooperative an easement that allows the cooperative to use their property for the purpose of constructing and maintaining "an electric transmission or distribution line or system." The easement further granted the right to remove trees and vegetation "to the extent necessary to keep them clear of said electric line or system."

In 1991, Hill County Electric entered into a "Joint Use Agreement" with a cable-television provider, which later assigned its rights under the agreement to Marcus Cable Associates, L.P. Under the agreement, Marcus Cable obtained permission from Hill County Electric to attach its cable lines to the cooperative's poles. The agreement permitted Marcus Cable to "furnish television antenna service" to area residents, and allowed the cable wires to be attached only "to the extent [the cooperative] may lawfully do so." The agreement further provided that the electric cooperative did not warrant or assure any "right-of-way privileges or easements," and that Marcus Cable "shall be responsible for obtaining its own easements and rights-of-way."

Seven years later, the Krohns sued Marcus Cable, alleging that the company did not have a valid easement and had placed its wires over their property without their knowledge or consent. The Krohns asserted a trespass claim, and alleged that Marcus Cable was negligent in failing to obtain their consent before installing the cable lines. The Krohns sought an injunction ordering the cable wires' removal, as well as actual and exemplary damages. In defense, Marcus Cable asserted a right to use Hill County Electric's poles under the cooperative's easement and under Texas statutory law.

Both parties filed motions for summary judgment. The Krohns moved for partial summary judgment, arguing that Marcus Cable's wires constituted a trespass. The Krohns requested the court to order the wires' removal and to set for trial the determination of damages. Marcus Cable filed a response and its own summary-judgment motion, arguing that both the Hill County Electric easement and section 181.102 of the Texas Utilities Code gave it the legal right to place its wires on the Krohns' property.

The trial court granted summary judgment in Marcus Cable's favor. The court of appeals reversed and remanded, holding that neither section 181.102 nor the easement allowed Marcus Cable's use. 43 S.W.3d at 579. We granted review to consider whether the cooperative's easement or section 181.102 permit Marcus

Cable to attach cable-television lines to Hill County Electric's utility poles without the Krohns' consent.

## II. Common Law

A property owner's right to exclude others from his or her property is recognized as " 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.' " *Dolan v. City of Tigard,* 512 U.S. 374, 384, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994) (quoting *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 433, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (quoting *Kaiser Aetna v. United States,* 444 U.S. 164, 176, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979))); *see also* II W. Blackstone, Blackstone's Commentaries 139 (Tucker ed. 1803). A landowner may choose to relinquish a portion of the right to exclude by granting an easement, but such a relinquishment is limited in nature. *Cf. San Jacinto Sand Co. v. Southwestern Bell Tel. Co.,* 426 S.W.2d 338, 345 (Tex.Civ.App.-Houston [14th Dist.] 1968, writ ref'd n.r.e.); *see generally* II George W. Thompson, Thompson on Property §§ 315–16, 319, at 6–7, 14–16, 32–34. Unlike a possessory interest in land, an easement is a nonpossessory interest that authorizes its holder to use the property for only particular purposes. *See* Restatement (Third) of Property (Servitudes) § 1.2 cmt. d.

Marcus Cable claims rights under Hill County Electric's express easement, that is, an easement conveyed by an express grant. *See DeWitt County Elec. Coop., Inc. v. Parks,* 1 S.W.3d 96, 103 (Tex.1999). While the common law recognizes that certain easements may be assigned or apportioned to a third party, the third party's use cannot exceed the rights expressly conveyed to the original easement holder. *See Cantu v. Cent. Power & Light Co.,* 38 S.W.2d 876, 877 (Tex.Civ. App.-San Antonio 1931, writ ref'd); *Keokuk Junction Ry. Co. v. IES Indus., Inc.,* 618 N.W.2d 352, 356, 362 (Iowa 2000); *Buhl v. U.S. Sprint Communications Co.,* 840 S.W.2d 904, 910 (Tenn.1992); *cf. Carrithers v. Terramar Beach Cmty. Improvement Assoc.,* 645 S.W.2d 772, 774 (Tex. 1983) ("[A]n easement may not create a right or interest in a grantee's favor which the grantor himself did not possess."). Marcus Cable's rights, therefore, turn on whether the cooperative's easement permits the Krohns' property to be used for the purpose of installing cable-television lines.

Marcus Cable raises three arguments to support its contention that the original easement encompasses cable-television use. First, it argues that easements must be interpreted to anticipate and encompass future technological developments that may not have existed when the easement was originally granted. Second, Marcus Cable contends that courts should give strong deference to the public policy behind expanding the provision of cable-television services. Third, Marcus Cable argues that its use is permitted because adding cable-television wires does not increase the burden on the servient estate. These arguments, however, ignore fundamental principles that govern interpreting easements conveyed by express grant. Those principles lead us to conclude that the original easement does not encompass Marcus Cable's use.

## A. Express Easements

We apply basic principles of contract construction and interpretation when considering an express easement's terms. *DeWitt County,* 1 S.W.3d at 100; *Armstrong v. Skelly Oil, Co.,* 81 S.W.2d 735, 736 (Tex.Civ.App.-Amarillo 1935, writ ref'd). The contracting parties' intentions, as expressed in the grant, determine the

scope of the conveyed interest. *See De-Witt County*, 1 S.W.3d at 103 (stating that "the scope of the easement holder's rights must be determined by the terms of the grant"); *see also Houston Pipe Line Co. v. Dwyer*, 374 S.W.2d 662, 664–65 (Tex.1964) (holding that parties' intentions are determined by interpreting the real-property grant's language); *Garrett v. Dils Co.*, 157 Tex. 92, 299 S.W.2d 904, 906 (1957) (same); *City of Dallas v. Etheridge*, 152 Tex. 9, 253 S.W.2d 640, 642 (1952) (same); Restatement (Third) of Property (Servitudes) § 4.1 (providing that an easement "should be interpreted to give effect to the intention of the parties ascertained from the language used in the instrument, or the circumstances surrounding the creation of the servitude, and to carry out the purpose for which it was created").

■ When the grant's terms are not specifically defined, they should be given their plain, ordinary, and generally accepted meaning. *DeWitt*, 1 S.W.3d at 101; *see also* Restatement (Third) of Property (Servitudes) § 4.1 cmt. d ("[Easement] language should be interpreted to accord with the meaning an ordinary purchaser would ascribe to it...."); Restatement (Second) of Contracts § 202(3)(a) ("Unless a different intention is manifested, where language has a generally prevailing meaning, it is interpreted in accordance with that meaning."). An easement's express terms, interpreted according to their generally accepted meaning, therefore delineate the purposes for which the easement holder may use the property. *See DeWitt*, 1 S.W.3d at 100, 103; *see also Coleman v. Forister*, 514 S.W.2d 899, 903 (Tex.1974); *Vahlsing v. Harrell*, 178 F.2d 622, 624 (5th Cir.1949) (applying Texas law). Nothing passes by implication "except what is reasonably necessary" to fairly enjoy the rights expressly granted. *Coleman*, 514 S.W.2d at 903; *Bland Lake*

*Fishing & Hunting Club v. Fisher*, 311 S.W.2d 710, 715–16 (Tex.Civ.App.-Beaumont 1958, no writ). Thus, if a particular purpose is not provided for in the grant, a use pursuing that purpose is not allowed. *See Coleman*, 514 S.W.2d at 903; *Kearney & Son v. Fancher*, 401 S.W.2d 897, 904–05 (Tex.Civ.App.-Fort Worth 1966, writ ref'd n.r.e.); *cf. Bickler v. Bickler*, 403 S.W.2d 354, 359 (Tex.1966). If the rule were otherwise,

> then the typical power line or pipeline easement, granted for the purpose of constructing and maintaining a power line or pipeline across specified property, could be used for any other purpose, unless the grantor by specific language negated all other purposes.

*Kearney & Son*, 401 S.W.2d at 904–05 (citing Lange, 4 Texas Practice, *Land Titles* § 384, at 173); *see also City of Pasadena v. California–Michigan Land & Water Co.*, 17 Cal.2d 576, 110 P.2d 983, 985 (1941) ("It is not necessary for [the easement grantor] to make any reservation to protect his interests in the land, for what he does not convey, he still retains.").

■ The common law does allow some flexibility in determining an easement holder's rights. In particular, the manner, frequency, and intensity of an easement's use may change over time to accommodate technological development. Restatement (Third) of Property (Servitudes) § 4.10. But such changes must fall within the purposes for which the easement was created, as determined by the grant's terms. *See id.* § 1.2 cmt. d ("The holder of the easement ... is entitled to make only the uses reasonably necessary for the specified purpose."); § 4.10 & cmt. a (noting that manner, frequency, and intensity of easement may change to take advantage of technological advances, but only for purposes for which easement was created); *see, e.g., Edgcomb v. Lower Val-*

ley Power & Light, Inc., 922 P.2d 850, 854–55, 858 (Wyo.1996) (holding that, under easement granted for an electric or telephone line, the easement holder could increase the electricity-carrying capacity and replace the static-telephone line with fiber-optics line as a matter of "normal development of the respective rights and use"); City Pub. Serv. Bd. of San Antonio v. Karp, 585 S.W.2d 838, 841–42 (Tex.Civ. App.-San Antonio 1979, no writ) (holding that a "transformer easement" permitted its holder to replace a malfunctioning underground transformer with an aboveground one as "a matter of normal development"); Lower Colo. River Auth. v. Ashby, 530 S.W.2d 628, 629, 632–33 (Tex. Civ.App.-Austin 1975, writ ref'd n.r.e.) (holding that, under the electric-transmission easement at issue, the easement holder could replace wooden towers with new steel towers and could increase the electricity-carrying capacity); RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 4.10 illus. 13 (stating that, under a 1940s telephone easement, easement holder could mount transmitters on its poles for cellular-telephone transmissions unless doing so would unreasonably interfere with enjoyment of the servient estate). Thus, contrary to Marcus Cable's argument, an express easement encompasses only those technological developments that further the particular purpose for which the easement was granted. See RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) §§ 1.2 cmt. d., 4.2 cmt. a, 4.10 & cmt. a. Otherwise, easements would effectively become possessory, rather than nonpossessory, land interests. See id. § 1.2 cmt. d (distinguishing between an easement that permits its owner to use land for only specified purposes, and a possessory land

interest that permits its owner to make any use of the property).

The emphasis our law places upon an easement's express terms serves important public policies by promoting certainty in land transactions. In order to evaluate the burdens placed upon real property, a potential purchaser must be able to safely rely upon granting language. See RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 4.1 cmt. d. Similarly, those who grant easements should be assured that their conveyances will not be construed to undermine private-property rights—like the rights to "exclude others" or to "obtain a profit"—any more than what was intended in the grant. See Loretto, 458 U.S. at 436, 102 S.Ct. 3164.

■ Marcus Cable suggests that we should give greater weight to the public benefit that results from the wide distribution of cable-television services, arguing that technological advancement in Texas will be substantially impeded if the cooperative's easement is not read to encompass cable-television use.[1] But even if that were so, we may not circumvent the contracting parties' intent by disregarding the easement's express terms and the specific purpose for which it was granted. See RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 4.1 & cmt. d (indicating that a court may not adopt an easement interpretation based on public policy unless that interpretation is supported by the grant's terms). Adhering to basic easement principles, we must decide not what is most convenient to the public or profitable to Marcus Cable, but what purpose the contracting parties intended the easement to serve. See Dauenhauer v. Devine, 51 Tex.

---

1. We note that the summary-judgment evidence indicates that Marcus Cable has readily available alternatives to attaching its cable lines to Hill County Electric's utility poles.

Furthermore, it is undisputed that cable-television providers may place their lines on public property in unincorporated areas. See TEX. UTIL.CODE § 181.102.

480, 489–90 (1879). Hill County Electric could only permit Marcus Cable to use its easement "so long as that use is devoted exclusively to the purposes of the grant." *Cantu*, 38 S.W.2d at 877.

■ Finally, Marcus Cable contends that its use should be allowed because attaching cable-television wires to Hill County Electric's utility poles does not materially increase the burden to the servient estate. But again, if a use does not serve the easement's express purpose, it becomes an unauthorized presence on the land whether or not it results in any noticeable burden to the servient estate. *See McDaniel Bros. v. Wilson*, 70 S.W.2d 618, 621 (Tex.Civ.App.-Beaumont 1934, writ ref'd) ("[E]very unauthorized entry upon land of another is a trespass even if no damage is done or the injury is slight ....."); *see also Rio Costilla Co-op. Livestock Ass'n v. W.S. Ranch Co.*, 81 N.M. 353, 467 P.2d 19, 25 (1970); *Beckwith v. Rossi*, 157 Me. 532, 175 A.2d 732, 735–36 (1961). Thus, the threshold inquiry is not whether the proposed use results in a material burden, but whether the grant's terms authorize the proposed use. With these principles in mind, we turn to the easement at issue in this case.

### B. Hill County Electric's Easement

■ Both parties urge us to determine Marcus Cable's easement rights as a matter of law. When an easement is susceptible to only one reasonable, definite interpretation after applying established rules of contract construction, we are obligated to construe it as a matter of law even if the parties offer different interpretations of the easement's terms. *DeWitt*, 1 S.W.3d at 100. Because the easement here can be given a definite meaning, we interpret it as a matter of law.

■ The easement granted Hill County Electric the right to use the Krohns'

property for the purpose of constructing and maintaining an "electric transmission or distribution line or system." The terms "electric transmission" and "electric distribution" are commonly and ordinarily associated with power companies conveying electricity to the public. *See, e.g., Texas Power & Light Co. v. Cole*, 158 Tex. 495, 313 S.W.2d 524, 526–27, 530 (1958); *Resendez v. Lyntegar Elec. Coop., Inc.*, 511 S.W.2d 350, 352–53 (Tex.Civ.App.Amarillo 1974, no writ); *Upshur–Rural Elec. Coop. Corp. v. State*, 381 S.W.2d 418, 424 (Tex. Civ.App.-Austin 1964, writ dism'd) (using terms electric transmission and/or distribution to describe equipment used by power companies to convey electricity); *see also* RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 4.10 illus. 3 & 12 (using "electric-transmission lines" to designate lines operated by power companies); TEX. UTIL.CODE § 39.157(a), (d)(3) (providing that Public Utility Commission shall regulate market-power abuses in the sale of electricity by utilities "providing electric transmission or distribution services"). Texas cases decided around the time the cooperative's easement was granted strongly suggest that this was the commonly understood meaning of those terms. *See, e.g., City of Bryan v. A & M Consol. Indep. Sch. Dist.*, 179 S.W.2d 987, 988 (Tex.Civ.App.-Waco 1944), *aff'd*, 143 Tex. 348, 184 S.W.2d 914 (1945); *Texas–New Mexico Utils. Co. v. City of Teague*, 174 S.W.2d 57, 59 (Tex.Civ.App.-Fort Worth 1943, writ ref'd w.o.m.); *Arcola Sugar Mills Co. v. Houston Lighting & Power Co.*, 153 S.W.2d 628, 629–30 (Tex.Civ.App.-Galveston 1941, writ ref'd w.o.m.); *McCulloch County Elec. Co-op., Inc. v. Hall*, 131 S.W.2d 1019, 1020, 1022 (Tex.Civ.App.-Austin 1939, writ dism'd); *Willacy County v. Central Power & Light Co.*, 73 S.W.2d 1060, 1061 (Tex.Civ.App.-San Antonio 1934, writ dism'd) (using term electric

transmission to describe equipment used by power companies to convey electricity). Accordingly, we construe the easement's terms to allow use of the property for facilities to transmit electricity.

Marcus Cable does not argue that the generally prevailing meaning of the easement's grant encompasses cable-television services. Instead, it claims that, for reasons of public policy, we should construe the easement to embrace modern developments, without regard to the easement's language. In support of that position, Marcus Cable cites a number of decisions in other jurisdictions that have allowed the use of easements predating cable technology to allow installation of cable transmission lines.

The cases Marcus Cable cites, however, involve different granting language and do not support the proposition that we may disregard the parties' expressed intentions or expand the purposes for which an easement may be used. To the contrary, those cases involve easements containing much broader granting language than the easement before us. Most of them involved easements granted for communications media, such as telegraph and telephone, in addition to electric utility easements. In concluding that the easements were broad enough to encompass cable, the reviewing courts examined the purpose for which the easement was granted and essentially concluded that the questioned use was a more technologically advanced means of accomplishing the same communicative purpose.

For example, in *Salvaty v. Falcon Cable Television*, the 1926 easement permitted its holder to maintain both electric wires *and* telephone wires. 165 Cal.App.3d 798, 212 Cal.Rptr. 31, 32, 35 (1985). The court held that cable-television lines were within the easement's scope, observing that cable television is "part of the natural evolution of *communications* technology." *Id.* at

34–35 (emphasis added); *accord Witteman v. Jack Barry Cable TV*, 228 Cal.Rptr. 584, 589 (Cal.Ct.App.1986) (same). Similarly, the Fourth Circuit held that an easement allowing its holder to use the land for the purpose of maintaining pole lines for "electrical and telephone service" was sufficiently broad to encompass cable-television lines. *C/R TV, Inc. v. Shannondale, Inc.*, 27 F.3d 104, 106, 109–10 (4th Cir.1994) (applying West Virginia law). In reaching its conclusion, the court relied on the similar communicative aspects of both "telephone services" and cable-television services. *Id.* at 109–10. Other cases Marcus Cable cites also involved easements granted for communications-transmission purposes. *See, e.g., Cousins v. Alabama Power Co.*, 597 So.2d 683, 686–87 (Ala.1992) (involving easements—granted for the purpose of maintaining "electric transmission lines and all telegraph and telephone lines"—that the landowners conceded included the right to maintain fiber-optics telecommunications lines); *Jolliff v. Hardin Cable Television Co.*, 26 Ohio St.2d 103, 55 O.O.2d 203, 269 N.E.2d 588, 591 (1971) (concluding that cable-television wires were a burden "contemplated at the time of the grants [to the power company], as evidenced by the specific reference to telegraph and telephone wires" in the 1940 easement); *Am. Tel. & Tel. Co. of Mass. v. McDonald*, 273 Mass. 324, 173 N.E. 502, 502–03 (1930) (concluding that easement granted for the purpose of maintaining "lines of telephone and telegraph" could be apportioned by the easement holder to a telephone company seeking to install a telephone cable, and that "[n]othing granted to the [company] enables it to do anything which the original grantee could not have done"); *Henley v. Continental Cablevision of St. Louis County, Inc.*, 692 S.W.2d 825, 827, 829 (Mo.Ct.App. 1985) (concluding that cable television fell within the 1922 easement grantors' ex-

pressed intention to provide "electric power and telephonic communications" to subdivision residents); *Hoffman v. Capitol Cablevision Sys., Inc.*, 52 A.D.2d 313, 383 N.Y.S.2d 674, 676, 677 (N.Y.App.Div.1976) (involving easements for the "distribution of electricity and messages," and concluding that cable-television wires were no greater burden "than that contemplated by the original easements").

We express no opinion about whether the cases Marcus Cable relies upon were correctly decided. But, unlike the cases Marcus Cable cites, Hill County Electric's easement does not convey the right to use the property for purposes of transmitting communications. While cable television may utilize electrical impulses to transmit communications, as Marcus Cable claims,[2] television transmission is not a more technologically advanced method of delivering electricity. Thus, the above-referenced cases do not support Marcus Cable's argument that the easement here encompasses the additional purpose of transmitting television content to the public.

Marcus Cable cites only two cases involving easements whose grants did not include telephone or telegraph services, and neither supports its position. In *Centel Cable Television, Inc. v. Cook*, the court interpreted easement language that permitted its holder to maintain "a line for the transmission and/or distribution of electric energy thereover, *for any and all purposes for which electric energy is now, or may hereafter be used.*" 58 Ohio St.3d 8, 567 N.E.2d 1010, 1014 (1991) (emphasis added). Observing that cable-television broadcasting *"utilize[s]* ... 'electric energy,'" the court concluded that the grant

language was broad enough to encompass cable television. *Id.* (emphasis added). And *Hise v. BARC Electric Cooperative*, 254 Va. 341, 492 S.E.2d 154, 158 (1997), involved a right-of-way easement by prescription that had been used for cable-television lines during the prescriptive period and that was later widened through eminent domain. It did not involve a privately-negotiated, express easement. *See, e.g., Nishanian v. Sirohi*, 243 Va. 337, 414 S.E.2d 604, 606 (1992) ("The use of an [express] easement must be restricted to the terms and purposes on which the grant was based." (citing *Robertson v. Bertha Mineral Co.*, 128 Va. 93, 104 S.E. 832, 834 (1920))). The easements in Marcus Cable's cited cases are simply not comparable to the more limited, express easement presented here.

Finally, Marcus Cable cites *San Antonio & Aransas Pass Railway v. Southwestern Telegraph & Telephone Co.*, 93 Tex. 313, 55 S.W. 117 (1900), for the proposition that an easement must be interpreted to embrace technological change. But that case does not support the idea that a court may ignore the contracting parties' intent as reflected in their written language. There, we were called upon to determine whether a statute granting condemnation power to "telegraph" companies applied equally to "telephone" companies. *Id.* Relying upon later statutory enactments that reflected the Legislature's intent to treat both the same, and recognizing that telegraph and telephone are two different means of accomplishing the same communicative purpose, we held that the statute

---

**2.** Marcus Cable did not offer any evidence about the nature of cable-television transmissions; thus, the record is silent on this point. But we note that, in recent years, many telecommunications providers, including cable-television operators, have moved toward fi-

ber-optics cables that use light lasers, rather than electrical impulses, to transmit communications over their lines to the public. *See, e.g.*, Mike Mills, *Fine Lines of Telecommunications*, THE WASH. POST, Aug. 5, 1996, at F17.

at issue applied to telephone companies. *Id.* at 118–19.

The dissenting Justice would hold that the easement could properly be read to encompass cable because electricity is used in the transmission of cable television signals. Under such a reading, however, the easement could also be used for telegraph or telephone lines. Obviously, the Krohns' predecessors could have granted an easement for those purposes. But the easement's specific terms cannot be read so broadly.

In sum, the easement language here, properly construed, does not permit cable-television lines to be strung across the Krohns' land without their consent. However laudable the goal of extending cable service might be, we cannot disregard the easement's express terms to enlarge its purposes beyond those intended by the contracting parties. To the extent the trial court granted Marcus Cable summary judgment on this basis, it erred, and the court of appeals correctly reversed.

### III. Section 181.102

Marcus Cable contends that, even if Hill County Electric's easement does not permit it to string cable-television wires across the Krohns' property, section 181.102 of the Texas Utilities Code does. That section, which allows cable-television service providers to utilize certain properties, provides:

(a) In an unincorporated area, a person in the business of providing community antenna or cable television service to the public may install and maintain equipment through, under, along, across, or over a utility easement, a public road, an alley, or a body of public water in accordance with this subchapter.

(b) The installation and maintenance of the equipment must be done in a way that does not unduly inconvenience the public using the affected property.

TEX. UTIL.CODE § 181.102.

Marcus Cable argues that the statute's plain language encompasses private easements like the one at issue here. Specifically, Marcus Cable contends that the term "utility easement" is not qualified by the term "public," as are other properties listed in the statute, and therefore the Legislature must have intended to cover private-easement grants to utility companies. The Krohns, on the other hand, argue that the statute's language, purpose, and legislative history support a distinction between general-use, public-utility easements and limited private-easement grants. We agree with the Krohns.

Our purpose in construing a statute is to determine the Legislature's intent. *See Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486, 493 (Tex.2001). As a starting point, we construe statutes as written and, if possible, ascertain intent from the statutory language. *Id.* (citing *Morrison v. Chan,* 699 S.W.2d 205, 208 (Tex.1985)). We may also consider other factors, including the object the statute seeks to obtain, legislative history, and the consequences of a particular construction. *Id.; see also* TEX. GOV'T CODE § 311.023. Moreover, we must always consider a statute as a whole and attempt to harmonize its various provisions. *Helena Chem.,* 47 S.W.3d at 493; *see also* TEX. GOV'T CODE § 311.021. We must also, if possible, construe statutes to avoid constitutional infirmities. *In re Bay Area Citizens Against Lawsuit Abuse,* 982 S.W.2d 371, 380 (Tex.1998); *Nootsie, Ltd. v. Williamson County Appraisal Dist.,* 925 S.W.2d 659, 662 (Tex.1996); *see also* TEX. GOV'T CODE § 311.021(1).

Applying these principles, we hold that section 181.102 does not encompass

private easements granted to utilities. The term "utility easement" appears in a list of properties—public roads, alleys, and public waterways—that are generally dedicated to public use. Subsection (b) goes on to prohibit cable companies from "unduly inconvenienc[ing] *the public using the affected property,*" indicating that the Legislature presumed public access to the property interests listed in subsection (a). TEX. UTIL.CODE § 181.102(b) (emphasis added). Thus, consistent with the nature of the other specified properties, and harmonizing the statute's subsections, "utility easement" can reasonably be read to cover only public easements, that is, those easements dedicated to the public's use. *See, e.g., Clark v. El Paso Cablevision, Inc.,* 475 S.W.2d 575, 577 (Tex.Civ.App.-El Paso 1971, no writ).

The limited legislative history that is available supports this interpretation. Statements were repeatedly made in hearings indicating that section 181.102 was intended to encompass only public easements. *Hearings on S.B. 643 Before the House Comm. on Urban Affairs,* 68th Leg., R.S. (April 28, 1983). Finally, construing the statute to cover only public easements avoids constitutional infirmities. In *Loretto,* the United States Supreme Court analyzed a New York statute that granted cable-television companies the right to place their equipment on apartment buildings, and held that applying the statute to private property would effect a "taking" in violation of the Fifth Amendment. *Loretto,* 458 U.S. at 421, 102 S.Ct. 3164. The Court reasoned that "a permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve," and

that "permanent occupations of land by such installations as telegraph and telephone lines ... or wires are takings even if they occupy only relatively insubstantial amounts of space and do not seriously interfere with the landowner's use of the rest of his land." *Id.* at 426, 430, 102 S.Ct. 3164. We also note that a number of federal courts, construing the Cable Communications Policy Act, have recognized the constitutional concerns that would arise from requiring private parties to grant property access to uninvited cable companies whenever a private easement has been granted to other specific service providers. *See, e.g., Cable Ariz. Corp. v. CoxCom, Inc.,* 261 F.3d 871, 876 (9th Cir. 2001); *TCI of N.D., Inc. v. Schriock Holding Co.,* 11 F.3d 812, 815 (8th Cir.1993); *Cable Holdings of Ga., Inc. v. McNeil Real Estate Fund VI, Ltd.,* 953 F.2d 600, 604–05 (11th Cir.), *cert. denied,* 506 U.S. 862, 113 S.Ct. 182, 121 L.Ed.2d 127 (1992); *Cable Invs., Inc. v. Woolley,* 867 F.2d 151, 159–60 (3d Cir.1989). Thus, construing section 181.102 to cover private property could have significant constitutional implications.

In sum, we hold that section 181.102 does not cover private-easement grants, like the one at issue here, that are negotiated between owners of private property and individual utility companies.[3]

## IV. Conclusion

We hold that Hill County Electric's easement does not convey the right to string cable-television wires over the Krohns' private property. Nor does section 181.021 confer such a right upon Marcus Cable, because the statute covers only utility easements that are dedicated to

---

**3.** In *Inwood West Civic Association v. Touchy,* 754 S.W.2d 276, 277 (Tex.App.-Houston [14th Dist.] 1988, orig. proceeding), in the course of considering a pre-trial discovery dispute, the court stated in dicta that section 181.102 gives "cable television companies free access to utility easements across private property for the installation of their equipment." We disapprove this statement.

public use. Accordingly, we affirm the court of appeals' judgment reversing and remanding this case to the trial court for further proceedings.

Justice HECHT filed a dissenting opinion.

Justice HECHT, dissenting.

The electric television (not its short-lived electro-mechanical predecessor) was conceived in 1921 by fourteen-year-old Philo Farnsworth, who made a working model in 1927,[1] twelve years before RCA's National Broadcasting Company first began regular telecasts from the World's Fair in New York City, and H.W. and Ruth Curtis granted Hill County Electric Cooperative an easement on their land north of Sardis, Texas, "to place, construct, operate, repair, maintain, relocate and replace . . . an electric transmission and distribution line or system". After 1939, television took off. Cable television is said to have originated in 1948 when John Walson of Mahanoy City, Pennsylvania, used a twin-lead wire to transmit an electric signal from a remote antenna to his store to demonstrate to his customers how reception could be improved and thereby increase his sales of the newfangled television sets.[2] The Curtises no doubt intended that by granting the Co-op an easement, wires strung on poles erected on their property would be used to transmit electric current to power lights and appliances. They probably did not envision that one such appliance in the Sardis area would be a television set. And they could not possibly have imagined that televisions powered by the electric current carried by lines over their easement would have better reception if supplied with an electric signal transmitted over another look-alike line hung on the same poles, even if the Curtises had been as precocious as Philo Farnsworth himself.

So if the question is, what were the Curtises thinking in 1939 when they gave the Co-op an easement for "an electric transmission and distribution line or system", the answer is easy: they were thinking about electric power, not an electric cable television signal, even though both are electric. But that's not the question because, as the Court correctly holds, the scope of an easement is measured by the parties' intent as expressed in the words used,[3] broadened by changes in the manner, frequency, and intensity of the intended use that are due to technological advances and do not unreasonably burden the servient estate.[4] An easement need not accommodate unintended uses merely because they present no additional burden, nor can an easement be enlarged merely because additional uses would benefit the public. But a use that is within the language of an easement as it has come to be understood with changes in technology is not prohibited simply because it was not part of the parties' original thinking. So

1. See generally Evan I. Schwartz, The Last Lone Inventor: A Tale of Genius, Deceit, and the Birth of Television (2002); Daniel Stashower, The Boy Genius and the Mogul: The Untold Story of Television (2002); Neil Postman, *Electrical Engineer*, Time, March 29, 1999, at 92 (quoting Farnsworth's son Kent as saying of his father: "I suppose you could say that he felt he had created kind of a monster, a way for people to waste a lot of their lives. Throughout my childhood his reaction to television was, 'There's nothing on it worthwhile, and we're not going to watch it in this house-

hold, and I don't want it in your intellectual diet.' ").

2. See S. Res. 445, 100th Cong. (1988).

3. *DeWitt County Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100–103 (Tex.1999). See Restatement (Third) of Property (Servitudes) § 4.1 (1998).

4. See Restatement, *supra* note 3, at § 4.10 & cmt. a.

the question in this case is whether a cable carrying an electric television signal to various users is "an electric transmission and distribution line or system" as we have come to understand more of what those words entail.

Now if one were to stick just to the words, the answer would clearly be yes. A television cable is a "line". A television signal is "electric", assuming, as the Court does, that the cable is not fiber optic (although even if the cable were fiber optic, the signal would still start out electric at the transmitter and end up electric at the receiver).[5] Sending the signal is "an electric transmission". Transmitting it among a number of users is "an electric distribution". Thus, a television cable is "an electric transmission and distribution line". Looking at a pole carrying lines transmitting electric power and a line transmitting television signals, a person unfamiliar with differences in the physics of the transmissions could not tell which was which.

But the Court answers the question no. Here is its analysis:

(1) "The terms 'electric transmission' and 'electric distribution' are commonly and ordinarily associated with power companies conveying electricity to the public." [6]

(2) "Texas cases decided around the time the cooperative's easement was granted strongly suggest that this was the commonly understood meaning of those terms." [7]

(3) "While cable television may utilize electrical impulses to transmit communications, as Marcus Cable claims, television is not a more technologically advanced method of delivering electricity." [8]

(4) Although easements for electric transmission have been held to include cable television signal transmission in all seven cases that have considered the matter in other jurisdictions,[9] the language of the easements in all those cases was broader.[10]

While each of these elements in the Court's reasoning is irrefutable, they prove nothing. The fact (1) that the words "electric transmission and distribution" are often used in reference to electric power does not mean that they therefore cannot be used in reference to any other electric transmission, like a cable television signal. In fact, the words have a broader reference. For example, a statute regulating telecommunications refers to "any type of system in which electric ... signals are

---

**5.** *Cf.* KENNETH T. DESCHLER, CABLE TELEVISION TECHNOLOGY 24 (1987) (explaining that for a signal broadcast by air, "[i]n effect, electrical energy from the transmitter is converted into electromagnetic energy by the antenna and radiated into space. On the reception end, electromagnetic energy is converted into electrical energy by the antenna and fed into the receiver.").

**6.** *Ante* at 703.

**7.** *Ante* at 703.

**8.** *Ante* at 705 (footnote omitted).

**9.** *Centel Cable Television Co. v. Cook,* 58 Ohio St.3d 8, 567 N.E.2d 1010, 1014–1015 (1991);

*Jolliff v. Hardin Cable Television Co.,* 26 Ohio St.2d 103, 55 O.O.2d 203, 269 N.E.2d 588, 591 (1971); *Salvaty v. Falcon Cable Television,* 165 Cal.App.3d 798, 212 Cal.Rptr. 31, 34–36 (1985); *Witteman v. Jack Barry Cable TV,* 228 Cal.Rptr. 584 (Cal.Ct.App.1986), *review dismissed,* 240 Cal.Rptr. 449, 742 P.2d 779 (Cal.1987); *Henley v. Cont'l Cablevision, Inc.,* 692 S.W.2d 825, 829 (Mo.Ct.App.1985); *Hoffman v. Capitol Cablevision Sys., Inc.,* 52 A.D.2d 313, 383 N.Y.S.2d 674, 677–678 (N.Y.App.Div.1976); *C/R TV, Inc. v. Shannondale, Inc.,* 27 F.3d 104, 108–109 (4th Cir. 1994) (applying West Virginia law).

**10.** *Ante* at 704.

used to transmit information, including a system transmitting information by ... wire or cable" [11]—in other words, an electric transmission system for information by line or cable. Of course, (2) the words could not have referred to a cable television signal in 1939, but only because no such thing existed, not because of the caselaw of the era. Our understanding of what "electric" means has changed immensely over time. Before Michael Faraday, Benjamin Franklin, and others discovered electric currents, "electric" referred to the static, magnetic condition of certain materials, like amber rubbed with a cloth.[12] Indeed, the word "electric" derives from the Latin, *electrum*, meaning "amber". The meaning of "electric", as we have come to understand better the phenomenon to which it refers, can no more be confined to electric current than it could to static electricity or cloth-rubbed amber. Caselaw reflecting the understanding of "electric" in 1939 does not dictate all that the word means.

As the Court says (3), television is certainly not a more technologically advanced

method of delivering electric current, but that simplistic observation begs the issue. Are the technological changes relevant to understanding the scope of the easement those in "electric transmission and distribution" of whatever nature, or only those in the transmission and distribution of electric *current?* The answer is the former, if we are to be faithful to the language of the easement. Is transmission of a cable television signal a more technologically advanced "electric transmission"? Clearly, yes.

The Court is correct (4) that in six of the seven cases from other jurisdictions that have considered whether an easement for electric transmission can be shared by cable television, the easements expressly permitted telephone lines.[13] Because the telephone is used for communication, the Court reasons, the easements in those cases were broader and could include—the Court will not say could *properly* include—cable television. Since the easement in the present case does not expressly allow for telephone lines, the Court concludes that it does not permit any use for pur-

11. TEX. OCC.CODE § 1701.405(a)(1)(B).

12. *See generally Ask the Globe,* THE BOSTON GLOBE, August 3, 1989, at 28 (explaining that, in 1600, Dr. William Gilbert coined the phrase 'electrica' in a book about amber); 10 ENCYCLOPEDIA AMERICANA 134 (Int'l ed.1976).

13. *Jolliff v. Hardin Cable Television Co.*, 26 Ohio St.2d 103, 269 N.E.2d 588, 590 (1971) (involving an easement "to construct, erect, operate and maintain a line of poles and wires for the purpose of transmitting electric or other power, including telegraph or telephone wires"); *Salvaty v. Falcon Cable Television,* 165 Cal.App.3d 798, 212 Cal.Rptr. 31, 32 (1985) (involving easement "for the construction, operation, repair and maintenance thereon and thereover of a pole line for the stringing of telephone and electric light and power wires thereon"); *Witteman v. Jack Barry Cable TV,* 228 Cal.Rptr. 584, 586 (Cal.Ct. App.1986), *review dismissed,* 240 Cal.Rptr.

449, 742 P.2d 779 (Cal.1987) (involving an easement for "constructing, adding to, maintaining, removing and repairing ... pole lines ... for the transmission of electrical energy and for telephone lines"); *Henley v. Cont'l Cablevision, Inc.*, 692 S.W.2d 825, 827 (Mo. Ct.App.1985) (involving an easement to "construct, reconstruct, repair, operate and maintain its lines for telephone and electric light purposes"); *Hoffman v. Capitol Cablevision Sys., Inc.*, 52 A.D.2d 313, 383 N.Y.S.2d 674, 676, 677–678 (1976) (involving an easement "to construct, maintain, operate, repair and replace lines, consisting of poles, conduits, guys, guy stubs, crossarms, wires and appurtenances for the distribution of electricity and messages"); *C/R TV, Inc. v. Shannondale, Inc.*, 27 F.3d 104, 109 (4th Cir.1994) (applying West Virginia law) (involving an easement for "the installation, erection, maintenance, repair and operation of electric transmission and distribution pole lines, and electric service lines, with telephone wires thereon").

poses of communication. But electric power is used for communication in the very important sense that neither a television nor a telephone will operate without it. Indeed, a television without a cable signal still has limited reception, while a television without electric power is nothing but a big doorstop, whether it is hooked up to cable or not. It is just not true that an easement for telephone wires contemplates the use of communication devices and an easement for electric current does not. It makes no sense to say, as the Court does, that because an easement for electric lines can be used to supply power to a television receiver, the easement excludes an electric line used to supply a signal to that receiver. It is not surprising, then, that the courts in the six cases do not draw this distinction; that is, none says that if an easement referred only to electric transmission and not telephone transmission, cable television transmission over the easement would be prohibited.

In fact, Marcus Cable asserts that no case in the country has ever barred cable television from an easement for electric transmissions, and neither the Krohns nor the Court has found one. Today's decision stands alone in the nation athwart the path to providing cable television and related services to rural areas. It directly conflicts with one of the seven cases that did not involve an easement that referred to telephone transmissions. There, the Supreme Court of Ohio held that an easement "for a line for the transmission and/or distribution of electric energy thereover, for any and all purposes for which electric energy is now, or may hereafter be used" allowed for a cable television line.[14] But the easement in that case only provided expressly what the law implies in the easement before us: that "elec-tric transmission and distribution" includes all purposes for which electric transmissions are now or may hereafter be used, uses made possible only by subsequent technological developments. The legal effect of the language in both easements should be the same.

I would hold that the easement in the present case can be shared with a cable television provider if the servient estate is not additionally burdened. The Krohns argue that there would be an additional burden for three reasons. First, the Krohns suggest that "the placement of the cable line decreases the clearance which we have through one of our entrances". Assuming that this is so, as we must in reviewing a summary judgment, there is no evidence that a cable line is or could be lower than lines already on the poles. The height of lines on electric poles is governed by statute.[15] If the clearance at an entrance is decreased, it is only because the decrease is permitted by law regardless of whether the easement is used for cable television or other electric transmission. Second, the Krohns argue that if the Co-op lets one cable television provider share the easement, federal law requires that it let all such providers do so on a nondiscriminatory basis, and if more providers are allowed to hang their wires on the poles, the burden to the servient estate will be increased as workers and equipment enter the property to construct and maintain the lines. Obviously, the Krohns' concern is somewhat iffy, but even if it were to begin to materialize, their easement would not be required to accommodate uses that presented an additional burden, and thus the number of users would be limited. Finally, the Krohns argue that to allow a cable television line on the Co-op's poles clouds

14. *Centel Cable Television Co. v. Cook,* 58 Ohio St.3d 8, 567 N.E.2d 1010, 1015 (1991).

15. Tex. Util.Code § 181.045.

their title. But the Krohns do not explain how their title is more affected by Marcus Cable's use of the easement than by the Co-op's use. Thus, I would conclude that the Krohns have failed to show that Marcus Cable's use of the easement poses any greater burden to their estate.

Two amici curiae in support of the Krohns' position [16] urgently warn that to allow Marcus Cable to share the Co-op's easement will profoundly impact the property rights of all Texas landowners. Other amici concur in less dramatic terms.[17] The threat they perceive is inconsistent with experience. The Texas Cable and Telecommunications Association, as amicus curiae for Marcus Cable, advises that cable television providers already share electric poles on easements covering thousands of miles in Texas. The Association states, and the United States Supreme Court confirms,[18] that this has been going on for decades all over the country. Although every case to consider the issue until today has allowed cable television lines to be hung on electric power and telephone poles, private land ownership has survived.

The Association, on the other hand, warns that this case "will significantly affect the future of the cable and telecommunications industries in Texas," especially in rural areas. The gravity of this threat cannot be evaluated without knowing how many of the thousands of other easements that are being used are like the one in this case, and whether the Court would con-

strue other language differently. One can reasonably expect, however, that there will be ample litigation over the matter, thereby increasing the costs of providing telecommunications services without affording any benefit.

I would hold that the Krohns' easement to the Co-op for electric transmission and distribution lines can be apportioned or divided with Marcus Cable, based on the development of cable television since the easement was granted in 1939. Accordingly, I respectfully dissent.

---

16. Independent Cattlemen's Association of Texas and Texas Forestry Association.

17. The Texas Land & Mineral Owners Association, The Texas and Southwestern Cattle Raisers Association, Temple–Inland Forest Products Corporation, International Paper Company, and Texas Farm Bureau.

18. *Federal Communications Comm'n v. Florida Power Corp.*, 480 U.S. 245, 247, 107 S.Ct. 1107, 94 L.Ed.2d 282 (1987) ("Cable televi-

sion operators, in order to deliver television signals to their subscribers, must have a physical carrier for the cable; ... [u]tility company poles provide ... virtually the only practical physical medium for the installation of television cables. Over the past 30 years, utility companies throughout the country have entered into arrangements for the leasing of space on poles to operators of cable television systems.")