Opinion issued November 8, 2007
















In The

Court of Appeals

For The

First District of Texas






NO. 01-06-00664-CV






NICK BARROW, Appellant


V.


CARL N. PICKETT, Appellee






On Appeal from the 344th District Court

Chambers County, Texas

Trial Court Cause No. 21724






MEMORANDUM OPINION

This is a real property dispute concerning the nature and scope of an express
easement. Appellant Nick Barrow, holder of the servient estate, appeals the trial
court's judgment permanently enjoining him from placing a two-wire electric cattle
gate across the roadway easement providing access to appellee Carl N. Pickett's
dominant estate. In his sole point of error, Barrow contends that the trial court erred
when it interpreted the Access Easement Agreement to mandate that Pickett's passage
along the easement be uninterrupted by obstructions and permanently enjoined
Barrow's use of the gate across the easement.

We reverse and render on the merits and remand for reconsideration of
attorney's fees.

Background


The previous owners of Barrow's 100-acre tract in Chambers County were
Jefferson Boyt, Mark Boyt, Lila Boyt, and Nada Lulic (the "Boyts"). In 1996, the
Boyts executed a formal Access Easement Agreement expressly granting a non-exclusive roadway easement appurtenant to the 640-acre estate immediately north of
their tract that was held in undivided interest by Bradford Pickett, Bernardine Pickett,
Edward B. Pickett, Carl N. Pickett, John Ager, Martha Ager Goodwin, Henry Ager,
and Robert Ager (the "grantees"). The grantees' estate is not served by a public road,
and, prior to the Access Easement Agreement, it was accessed by a private road that
joins the public roadway at the southwest corner of the Boyts' estate. From the public
roadway, the private road continues north to provide entry to the southwest corner of
the grantees' estate. Approximately halfway between the public roadway to the south
and the grantees' property line to the north, a second private road branches off the
easement to the east. This road continues across the Boyt-Barrow tract and provides
the grantees with a second entry point to their undeveloped 640-acre tract. (1)

The Access Easement Agreement created by the Boyts and signed on July 14,
1996, conveyed to the grantees a "thirty foot access easement on, over, and across the
Easement Tract. . . ." The agreement stipulated that the easement be "a perpetual,
non-exclusive easement for pedestrian and vehicular ingress, egress, and access on,
over, and across the Easement Tract." The 1996 grant also included an express
statement that the easement should bind the respective parcels and constitute a real
covenant running with the land. The document named the grantees, and it was signed
by the Boyts. It was registered in the county deed office and was mentioned in the
subsequent Boyt-Barrow general warranty deed, which incorporated the language of
the Access Easement Agreement by reference.

After the Boyts executed the Access Easement Agreement, they sold the 100-acre tract to Barrow. Soon after acquiring the land, Barrow constructed a home for
his family on the tract. In addition to using the land as a residence, Barrow sought
to divide the land in his tract so that one portion might be used as a hay field while
the remainder could be dedicated to pasturing several horses and his small herd of
cattle. Barrow consistently permitted the grantees, various utilities, and several oil
companies access over the easement in accordance with the agreement. (2) Currently,
Barrow's family uses the roadways several times daily, while Pickett passes along the
easement an estimated thirty to forty times annually. Pickett uses his unimproved 640
acres primarily for hunting.

In 2003, Barrow joined a fence located along the western side of the north-south private road with a fence along the north side of the east-west private road by
erecting a two-wire electric gate intended to separate the livestock from the hay field. 
The electric gate crossed the north-south private road approximately halfway between
the public road and the entrance to the grantees' property. For Pickett to get to his
land, he had to stop, open the gate, drive through, and close the gate. Barrow's gate 
was not secured to prohibit any of the grantees access to the dominant estate.

Pickett was unhappy with the gate and attempted to resolve the matter through
repeated letters and informal discussions. Pickett offered to split the cost of a cattle
guard and to install the guard for Barrow. Barrow indicated that use of a cattle guard
alone was insufficient to contain his livestock because they could jump across the
cattle guard. He testified that, at another location on his property, he previously had
to add a gate across an existing cattle guard to keep his herd from escaping. Pickett
also suggested that Barrow move the gate to another part of the private roadway
offering access to both tracts of land. However, Pickett's suggested location was not
feasible in that it would require Barrow and his family to unhook the gate at least six
times a day in order to access their home.

When the parties could not resolve the issue, Pickett sued Barrow to
permanently enjoin Barrow's placement of a gate across the easement. In a 2006
bench trial, the trial court interpreted the Access Easement Agreement based on
documentary evidence and the testimony of Pickett and Barrow. It held that the
agreement granted Pickett and the other grantees "free and uninterrupted" passage
along the easement as a matter of law. The trial court also found that "[Pickett], as
an owner of the dominant estate, is entitled to use the road and said easement on the
servient estate for said purposes of access, ingress and egress, free and
uninterrupted," and that "[Barrow] placed or caused to be placed a gate across the
road and said easement on the servient estate and the gate[] interfere[s] unreasonably
with [Pickett's] right to use the road and said easement on the servient estate for said
purposes of access, ingress and egress." The court ordered Barrow to remove the
gate, and it granted a permanent injunction prohibiting him from placing any gates
along the access road. The trial court also awarded Pickett $2,525.75 in attorney's
fees. Barrow appeals the trial court's interpretation of the Access Easement
Agreement.

Standard of Review

The issue before this court is whether or not the trial court correctly construed
the Access Easement Agreement. The rules of contract construction and
interpretation apply to easement agreements. DeWitt County Elec. Coop., Inc. v.
Parks, 1 S.W.3d 96, 100 (Tex. 1999). When a contract is not ambiguous, the court
is obligated to interpret the contract as a matter of law. Id. We review de novo a trial
court's interpretation of contracts granting easements. See J.M. Davidson, Inc. v.
Webster, 128 S.W.3d 223, 227 (Tex. 2003) (interpretation of contract's arbitration
clause reviewed de novo); Centerpoint Energy Houston Elec., L.L.P. v. Old TJC Co.,
177 S.W.3d 425, 430 (Tex. App.--Houston [1st Dist.] 2005, pet. denied)
(interpretation of contract conveying interest in real property reviewed de novo). If
we reverse a trial court's judgment after a de novo review, we must render the
judgment that the trial court should have rendered, unless remand is necessary for
further proceedings or the interests of justice require remand for a new trial. Tex. R.
App. P. 43.3.

Analysis

An easement is a non-possessory interest in another's property that authorizes
its holder to use that property for a particular purpose. Marcus Cable Assocs. v.
Krohn, 90 S.W.3d 697, 700 (Tex. 2002). When considering the terms of a writing
granting an express easement, we apply basic principles of contract construction and
interpretation. Id. The contracting parties' intentions as expressed in the grant
determine the scope of the interest conveyed. Id. at 700-01. We read the terms of an
easement as a whole to reach an adequate interpretation of the parties' intentions and
to carry out the purpose for which the easement was created. Id. at 701. Unless the
language is ambiguous, we rely solely on the written instrument. Koelsch v.
Industrial Gas Supply Corp., 132 S.W.3d 494, 498 (Tex. App.--Houston [1st Dist.]
2004, pet. denied).

A grant of an easement in general terms implies a grant of unlimited reasonable
use such as is reasonably necessary and convenient and as little burdensome as
possible to the servient owner. Coleman v. Forister, 514 S.W.2d 899, 903 (Tex.
1974); Whaley v. Cent. Church of Christ of Pearland, 227 S.W.3d 228, 231 (Tex.
App.--Houston [1st Dist.] 2007, no pet.) ("In determining the scope of an easement,
'we may only imply those rights reasonably necessary to the fair enjoyment of the
easement with as little burden as possible to the servient owner.'") (quoting Lakeside
Launches, Inc. v. Austin Yacht Club, Inc., 750 S.W.2d 868, 871 (Tex. App.--Austin
1988, writ denied)). Other courts have held that an easement gives no exclusive
dominant right over the servient estate that is unnecessary to the enjoyment of the
easement, and the owner of the dominant estate must make a reasonable use of his
rights so as not to interfere unreasonably with the property rights of the owner of the
servient estate. Stout v. Christian, 593 S.W.2d 146, 150 (Tex. Civ. App.--Austin
1980, no writ) (quoting San Jacinto Sand Co. v. Sw. Bell Tel. Co., 426 S.W.2d 338,
345 (Tex. Civ. App.--Houston [14th Dist.] 1968, writ ref'd n.r.e.)).

Here, the parties do not contest the geographic scope of the easement; rather,
they contest only the interpretation of the rights granted by the Access Easement
Agreement. Unless the language of the easement agreement is ambiguous, we will
rely solely on the written instrument. See Koelsch, 132 S.W.3d at 498. In the
absence of pleadings showing cause for going outside the language of the deed, such
as fraud or equitable estoppel, we must rely on the instrument alone. Coleman, 514
S.W.2d at 903. Neither party has argued that the Access Easement Agreement is
ambiguous as it is written, and there are no pleadings to indicate the writing is not
reliable; therefore, we rely solely on the written instrument. See id.; Koelsch, 132
S.W.3d at 498.

The text of the document granting the easement uses general terms to create the
easement. The document provides that the named grantees and all others who may
later have an interest in the 640-acre tract have the right to cross the servient estate
to access their property. The document specifically includes the word "non-exclusive" to indicate that the grantees would share use of the easement with other
parties, including the possessor of the servient estate. Because the grant is in general
terms, the grantees' dominant estate is entitled only to rights sufficient to effect the
purpose of the easement. See Coleman, 514 S.W.2d at 903. The easement agreement
does not specifically grant the dominant estate the right to an easement "free and
uninterrupted" by gates. The grant provides only for ingress and egress to the
dominant estate. To find a grant of unrestricted passage, therefore, we would have
to read terms into the four corners of the document that are not there, which we
cannot do. See id.; Marcus Cable Assocs., 90 S.W.3d at 700; Koelsch, 132 S.W.3d
at 498.

Because it is written in general terms, the agreement grants Pickett such
unlimited reasonable use of the easement as is reasonably necessary and convenient
and as little burdensome as possible to Barrow. See id.; Whaley, 227 S.W.3d at 231. 
We conclude that by enjoining Barrow from using his gate, the trial court allowed the
dominant estate's use of the easement to interfere unreasonably with Barrow's
property rights. See Stout, 593 S.W.2d at 150. Unless Barrow can use the gate as he
placed it in 2003, he will not be able to keep his grazing cattle out of his hay fields
and also provide them access to water. Moving the gate to another location on the
private road would interfere with Barrow's access to his residence. While Pickett's
right to use the easement is protected and undisputed, he does not have the right to
add requirements to the terms of the Access Easement Agreement or to interfere
unreasonably with Barrow's rights. By contrast, Barrow's gate does not unreasonably
interfere with Pickett's use of the easement to access his property the 30 to 40 times
a year that he does so.

Pickett contends, however, that he should be allowed unimpeded use of the
easement because it was the intent of the parties to create an easement unimpeded by
gates or other obstructions. Pickett points to the decades of ungated passage by his
family and his ancestors across this tract of land to support this contention. (3) Pickett
relies on Arden v. Boone for the proposition that, in determining the scope of the
easement, we must examine the manner in which it has previously been used. 221
S.W. 265, 266 (Tex. Comm'n App. 1920, judgm't approved). The Arden court stated
that whether a party has a right to erect a gate depends on the intent of the parties as
determined by the terms of the grant, its purpose, the nature and situation of the
property, and the manner in which it has been used. Id. Pickett argues that the fourth
provision of Arden requires the court to note that, because no gates existed
previously, it was the intent of the parties to maintain the status quo--a road without
gates. However, Pickett's argument ignores the emphasis courts place on the
unambiguous written agreement. See Marcus Cable Assocs., 90 S.W.3d at 700;
Coleman, 514 S.W.2d at 903; Koelsch, 132 S.W.3d at 498. (4)

Because the terms of the grant are unambiguous and conveyed only the rights
that are necessary to effect the grant and that are as little burdensome on the servient
estate as possible, we conclude that Pickett's rights are for reasonably unlimited
ingress and egress only. See Coleman, 514 S.W.2d at 903; Whaley, 227 S.W.3d at
231. Thus, the trial court erred when it interpreted the Access Easement Agreement
to grant Pickett the right of free and uninterrupted passage along the easement.

We sustain Barrow's sole point of error.

Conclusion

 We reverse the trial court's orders granting injunctive relief and render
judgment that the temporary, permanent, and mandatory injunctions are dissolved. 
We reverse that portion of the trial court's judgment awarding attorney fees to Pickett
and remand that issue to the trial court for further proceedings consistent with this
opinion.





 Evelyn V. Keyes

 Justice


Panel consists of Justices Nuchia, Jennings, and Keyes.

Appendix 1
1. A diagram of the tracts of land and roads involved is attached as Appendix 1 to then
end of this opinion.
2. The Boyts drafted a sophisticated warranty deed conveying the 100-acre tract to
Barrow that retained not only all subsurface oil, gas, mineral rights, and other rights
involving crops. Oil companies were permitted to use the easement to service the
Boyts' remaining interests.
3. It should be noted that the record indicates that there have been gates along the access
roads at some point in the past. One is currently located at the entrance to the
easement from the public roadway, and another was located farther along one of the
two access roads but was not used.
4. Pickett also relies on Burns v. McDaniel, 158 S.W.2d 826, 827 (Tex. Civ.
App--Eastland 1942, no writ) and McDaniel v. Calvert, 875 S.W.2d 482, 485 (Tex.
App.--Fort Worth 1994, no writ) for the proposition that a previous absence of gates
indicates an intent that no future gates exist. Burns is inapplicable because the
easement granted in that case was "[to be] kept open" as a dedicated public roadway,
not a private one. See Burns, 158 S.W.2d at 827. Calvert is distinguishable because
the easement straddled and followed the property line of the two parties, and each
party was one-half dominant estate and one-half servient estate, so permitting a single
party to erect a gate where both had owned and used the easement for twenty years
was held unjust. See Calvert, 875 S.W.2d at 484-85.