# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00690-CV

**Harbor Ventures, Inc., Rand Forest d/b/a Shoreline Development, and LTYH, LLC, Appellants**

**v.**

**Tim Dalton, Sandra McKenney, and Susan Brown, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT
### NO. D-1-GN-05-002738, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This dispute involves the scope of two easements burdening a piece of lakefront property ("the Harbor Ventures Property") located on Graveyard Point, a peninsula on Lake Travis, currently owned by appellant LTYH, LLC.[1]  The easements at issue are covenants running with two tracts of land, one owned by appellees Tim Dalton and Sandra McKenney ("the Dalton-McKenney Tract") and the other owned by appellee Susan Brown ("the Brown Tract").  The two tracts are adjacent pieces of landlocked property located directly south of the Harbor Ventures Property and separated from it by a road.  Also in dispute is whether, by application of the implied reciprocal negative easement doctrine, the Harbor Ventures Property is encumbered by a restrictive

---

[1]  Through trial of the underlying cause, the Harbor Ventures Property was owned by Harbor Ventures, Inc.  In October 2010, LTYH, LLC acquired the property through foreclosure.  After the judgment had been signed, LTYH intervened in the action to appeal portions of the judgment that relate to encumbrances on the property.

covenant prohibiting commercial activity. We will reverse the trial court's judgment in part and affirm it as modified in part.

## FACTUAL AND PROCEDURAL BACKGROUND

The land constituting Graveyard Point was part of the Stewart Ranch owned by A.K. and Annie Stewart. Beginning in the 1940s, A.K. and Annie Stewart—and after A.K. Stewart's death, Annie Stewart individually and as executrix of his estate—partitioned a number of tracts from their property and conveyed them to third parties by deeds containing metes and bounds descriptions.[2] These tracts are predominantly landlocked lots located within an area bounded by a roadway (Chipmonk Road) that roughly follows the 715' contour line of Lake Travis,[3] but also include two lakefront tracts on the other side of Chipmonk Road, adjacent to the 2.525-acre Harbor Ventures Property, and two tracts on the southwesternmost portion of the Stewart Ranch property. The deeds conveying each of these tracts, with the exception of one of the landlocked tracts, included a restrictive covenant prohibiting use of the conveyed tract for a commercial enterprise.[4] The Dalton-McKenney Tract and the Brown Tract are two of the landlocked lots conveyed by a deed containing the commercial-use restriction.

---

[2] Exhibits admitted at trial indicate that between 1943 and 1952, A.K. and Annie Stewart, or Annie Stewart individually and as executrix of A.K. Stewart's estate, conveyed 42 such tracts.

[3] Evidence admitted at trial indicated that at its average level, the water's edge of Lake Travis follows the 670' contour line. In 1940 the Lower Colorado River Authority obtained an easement from A.K. Stewart and Annie Stewart permitting it to inundate the property up to the 715' contour line.

[4] Typically, the deeds included the following language: "It is agreed and understood that no commercial enterprise shall ever be operated upon said land herein conveyed."

2

Annie Stewart also conveyed several pieces of property to each of her seven children. These included six adjacent landlocked tracts that were bounded by Chipmonk Road and seven larger adjacent lakefront tracts that were located on the northernmost portion of the peninsula.[5] The deeds conveying these properties included metes and bounds descriptions of the property conveyed but did not contain a restrictive covenant prohibiting commercial use.

After Annie Stewart's death, her son Arthur Stewart, individually and as executor of her estate, partitioned fifteen lakefront tracts and conveyed them to third parties by deeds that included metes and bounds descriptions of the tract and contained a restrictive covenant prohibiting commercial use. These tracts were each approximately 0.1 to 0.2 acres in size. Thereafter, the Estate of Annie Stewart recorded a subdivision plat for the Annie Stewart Subdivision that subdivided most of the remainder of the Stewart Ranch property into lots. The subdivision plat identifies these lots as Sections A through H of the Annie Stewart Subdivision. The property not included in the subdivision consists of two tracts of lakefront property, one of which is the Harbor Ventures Property. Ownership of the Harbor Ventures Property eventually passed to Annie Stewart's heirs, Dorothy Jean Stewart Uzzell and Betty Ann Stewart Hanson, who conveyed it in 1997 to Harbor Ventures. This conveyance does not contain a restrictive covenant prohibiting commercial use of the Harbor Ventures Property.

The original conveyances of the Dalton-McKenney Tract and the Brown Tract each contain the following express easement:

---

[5] The landlocked tracts ranged in size from 0.35 to 0.77 acres, whereas the lakefront tracts ranged in size from 1.65 to 2.97 acres.

> [I]t is understood and agreed that the grantors herein hereby give and grant unto the grantee, his heirs and assigns, a perpetual easement on and across the land lying immediately North and adjacent to the tract herein conveyed and between prolongations of the East and West boundary lines of the tract herein conveyed and between said tract of land and the contour line which is 670 feet above mean sea level as established by the United States Geological Survey Bench Marks; said easement shall be for the purposes of ingress and egress from the tract of land herein conveyed to Lake Travis. The grantee, her heirs and assigns, shall have the right to construct roads and walkways, one or both or more of each, on and across said land and shall have the right to cut the underbrush and to trim the trees situated thereon, and to do any act or thing on said land which will in any wise beautify or improve the appearance of either the land across which said easement is granted or the tract of land above conveyed; and that the foregoing easement, restriction, covenant and agreements shall be deemed covenants running with the land and shall be binding upon the grantors herein, their heirs and assigns.

Disputes arose between Harbor Ventures and Dalton, McKenney, and Brown regarding the scope of rights granted in the easements. In August 2005, Dalton and McKenney sued Harbor Ventures, Flagship Marine Corporation (an entity that leased the Harbor Ventures Property), and Rand Forest d/b/a Shoreline Development (Forest is president of Harbor Ventures) alleging that the defendants had interfered with their lawful use and enjoyment of the easement in various ways, including blocking the easement with a large log and dumping refuse—including glass, metal, concrete, and oil—on the Harbor Ventures Property and in the water. Dalton and McKenney sought a declaration that the easement was valid and that the defendants' conduct was preventing them from exercising their rights under the easement; they also requested injunctive relief to prevent the defendants from hindering their use of the easement in the future and to require that they remediate the damage done to the Harbor Ventures Property. Dalton and McKenney also claimed that the Harbor Ventures Property was subject to a restrictive covenant prohibiting commercial activity, alleging that this

4

restriction was "part of the scheme of development in this area such that it applies to the Defendants' actions" on the Harbor Ventures Property. Dalton and McKenney alleged that the defendants' activities violated this restrictive covenant and sought monetary damages and injunctive relief. Brown also sued Harbor Ventures, Flagship Marine, and Forest, and the two cases were consolidated into one.

After a bench trial, the trial court rendered judgment declaring the scope of the Dalton-McKenney and Brown easements and declaring that, "by virtue of the negative reciprocal easement doctrine, the Harbor Ventures Property is burdened with a restrictive covenant prohibiting the operation of a commercial enterprise on the Harbor Ventures Property." The judgment awarded both Dalton and McKenney and Brown $31,999.99 as actual damages for their loss of use of the easements and included attorneys' fee awards of $83,000 to Dalton and McKenney and $42,000 to Brown, for which Harbor Ventures, Forest, and Flagship Marine were held jointly and severally liable. Thereafter, the trial court signed findings of fact and conclusions of law, and this appeal followed. In five issues, appellants contend that the trial court erred in (1) concluding that the Harbor Ventures Property is encumbered with a restriction against commercial use; and (2) construing the scope of the Dalton-McKenney and Brown express easements. They also challenge the sufficiency of the evidence supporting the damage awards and contest the award of attorneys' fees.

## DISCUSSION

*Implied reciprocal negative easement*

The trial court found that the Harbor Ventures Property, which was retained by Annie Stewart and ultimately conveyed by her heirs to Harbor Ventures in 1997, was encumbered by a restrictive covenant prohibiting commercial use through application of the implied reciprocal negative easement doctrine. The supreme court has adopted the following as a "reasonably accurate general statement of the doctrine":

> [W]here a common grantor develops a tract of land for sale in lots and pursues a course of conduct which indicates that he intends to inaugurate a general scheme or plan of development for the benefit of himself and the purchasers of the various lots, and by numerous conveyances inserts in the deeds substantially uniform restrictions, conditions and covenants against the use of the property, the grantees acquire by implication an equitable right, variously referred to as an implied reciprocal negative easement or an equitable servitude, to enforce similar restrictions against that part of the tract retained by the grantor or subsequently sold without the restrictions to a purchaser with actual or constructive notice of the restrictions and covenants.

*Evans v. Pollock*, 765 S.W.2d 465, 466 (Tex. 1990) (quoting *Minner v. City of Lynchburg*, 129 S.W.2d 673, 679 (Va. 1963) (citations omitted)). In order to impose a restrictive covenant by implication on property retained by the original grantor, there must be evidence that (1) the grantor intended to adopt a scheme or plan of development that encompassed *both* the property conveyed *and* the property retained, and (2) the grantor subdivided the property into lots and included in the deeds of the properties conveyed substantially uniform restrictions designed to further the scheme or plan. *Id.* Under these circumstances, the burden the grantor has placed on the land conveyed is, by operation of law, reciprocally placed on the land he retained. *Saccomanno v. Farb*, 492 S.W.2d 709,

6

713 (Tex. Civ. App.—Waco 1973, writ ref'd n.r.e.) (citing 20 Am. Jur. 2d *Covenants, Conditions and Restrictions* § 733 (1965)). When seeking to impose the restrictive covenant on property retained initially by the grantor but subsequently sold to a third party, there must also be evidence that the subsequent purchaser had actual or constructive notice of the existence of those restrictions on the other properties included in the scheme or plan of development. *See Evans*, 792 S.W.2d at 466 (lots sold by owner from development without express restrictions to grantee *with notice* of restrictions in other deeds are burdened with implied reciprocal negative easement and may not be used in violation of restrictive covenants burdening lots sold with express restrictions). The *Saccomanno* court observed that "the doctrine should be used and applied with extreme caution, for it 'involves difficulty' and lodges discretionary power in a court of equity to deprive a man of his property, to a degree, by imposing a servitude by implication," *id*. at 713, a practice consistent with "the settled rule in Texas that alleged restrictive clauses in instruments concerning real estate must be construed strictly, and all doubts . . . resolved in favor of the free and unrestricted use of the property," *id.* (citing *Baker v. Henderson*, 153 S.W.2d 465, 470 (Tex. 1941); *Southampton Civic Club v. Couch*, 322 S.W.2d 516, 518 (Tex. 1959)).

We first consider whether there is evidence that A.K. and Annie Stewart or, after A.K. Stewart's death, Annie Stewart individually and as executrix of his estate, intended to "inaugurate a general scheme or plan of development" that encompassed both the Harbor Ventures Property and the tracts partitioned and conveyed, and intended that none of the property could be used for commercial enterprise. As the basis for applying the implied restrictive negative easement doctrine, the trial court judgment found:

7

A.K. Stewart and Annie Stewart, and after the death of A.K. Stewart, Annie Stewart individually and as executrix of the Estate of A.K. Stewart, developed the Stewart Tract in a course of conduct which indicates that they intended to inaugurate a general scheme or plan of development for the benefit of themselves and the purchasers of the various subdivided portions of the Stewart Tract that would prohibit any portions of the Stewart Tract from being used for the operation of a commercial enterprise.

Appellants contend that there is legally and factually insufficient evidence to support this finding.

In an appeal from a judgment rendered after a bench trial, the trial court's findings of fact have the same weight as a jury's verdict, and we review the legal and factual sufficiency of the evidence to support them as we would review a jury's findings. *See Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). When, as here, a party challenges the legal sufficiency of the evidence supporting an adverse finding, we will sustain the legal-sufficiency challenge if the record reveals (1) the complete absence of evidence of a vital fact; (2) that the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) that the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) that the evidence conclusively establishes the opposite of a vital fact. *See City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharms. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). If the evidence supporting a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, it is no evidence of that fact. *See Haynes & Boone v. Bowser Bouldin, Ltd.*, 896 S.W.2d 179, 182 (Tex. 1995). Conversely, evidence conclusively establishes a vital fact when

8

the evidence is such that reasonable people could not disagree in their conclusions. *City of Keller*, 168 S.W.3d at 814-17.

When conducting a legal-sufficiency review, we must view the evidence in the light most favorable to the trial court's findings, "crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Id.* at 807. Moreover, we must indulge every reasonable inference that would support the trial court's findings. *Id.* at 822. The ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *See id.* at 827.

In reviewing a factual-sufficiency challenge, we examine the entire record and consider and weigh all the evidence, both in support of and contrary to the challenged finding. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). When, as here, a party challenges the factual sufficiency of the evidence supporting an adverse finding on which it did not have the burden of proof at trial, we set aside the finding only if the evidence is so weak as to make the finding clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

As evidence of the existence of a general scheme or plan of development, the trial court found the following:

> The deeds of conveyance for all but one of the subdivided portions of the Stewart Tract conveyed by A.K. Stewart and/or Annie Stewart to third-parties, other than persons within the first degree of consanguinity or affinity of A.K. Stewart and Annie Stewart, included substantially uniform restrictive covenants prohibiting the operation of a commercial enterprise on such land conveyed.

9

There are no other findings of fact regarding a general scheme or plan of development. In her brief, Brown similarly relies solely on evidence of the restrictions against commercial use that were placed on all but one of the lots conveyed to third parties (i.e., non-family members) to establish a general plan or scheme of development.[6] This evidence, however, without more, is legally insufficient to support the finding that the Stewarts intended to "inaugurate a general scheme or plan of development." The fact that the original grantor inserts substantially similar restrictions in deeds of property conveyed, standing alone, is no evidence of a scheme or plan of development that could justify imposing a similar implied restriction on property the grantor retained. *See Saccommanno*, 492 S.W.2d at 713 ("[T]he fact that in the deed of conveyance a grantor imposes restrictions on a part of a tract which he sells and declares that the restrictions are to run with the land does not, by itself, raise any legal or factual presumption that he means thereby to so restrict the retained portion of the tract."); *Cambridge Shores Homeowners Ass'n v. Spring Valley Lodge Co.*, 422 S.W.2d 10, 13 (Tex. Civ. App.—Dallas 1967, no writ) (mere fact that deeds contain identical restrictions is not alone sufficient to establish the existence of general scheme); *see also* 20 Am. Jur. 2d *Covenants, Conditions, and Restrictions* § 168 (1965) (mere fact that grantor imposes restrictions on part of tract of land he is selling does not necessarily lead to conclusion that he intended thereby to have restrictions apply to his remaining land). Although all but one of the deeds for the smaller lots conveyed include restrictions on commercial use, an intent to restrict the land retained by the grantor may not be inferred unless there is additional evidence that the grantor intended to restrict an entire area, as part of a general scheme or plan of development, that includes the property retained. *See*

---

[6] Dalton and McKenney did not file briefs in this appeal.

*Cambridge Shores*, 422 S.W.2d at 13; *see also Green v. Gerner*, 289 S.W. 999 (Tex. Comm'n App. 1927, judgm't adopted) ("Such fact construed in the light of the surrounding circumstances may or may not be sufficient to support a finding of a general scheme."). In the present case, the surrounding circumstances do not support an inference that Annie Stewart intended a general plan or scheme of development for the entire Stewart Ranch, including the Harbor Ventures Property, that prohibited commercial use. To the contrary, the record evidences that Annie Stewart conveyed most of the larger lakefront lots, those similarly situated to the Harbor Ventures Property, *without* restrictions on commercial use.[7]

Our holding is consistent with the conclusions reached by other courts asked to impose restrictive covenants by implication, all of which have required more than the mere existence of substantially similar restrictions in a number of conveyances by the original grantor. For example, in *Evans v. Pollock*, the original grantor owned a tract of land on a Lake Travis peninsula with a configuration similar to Graveyard Point. The original grantor subdivided the lakefront property into smaller lots and sold a number of them with restrictive covenants against commercial use. The grantor retained four of the lakefront lots, as well as all of the landlocked hilltop portion of the tract, which was not subdivided. The supreme court found that the four lakefront lots retained by the original owner were subject to the restrictive covenants included in the deeds of the other similarly

---

[7] Although the Stewarts' heirs subsequently partially subdivided these large tracts and conveyed many of them with restrictions on commercial use, such subsequent conveyances, without more, are no evidence of the original grantor's intent to create a common scheme or plan that included all the property she owned. *See Saccomanno v. Farb*, 492 S.W.2d 709, 713 (Tex. Civ. App.—Waco 1973, writ ref'd n.r.e.) (implied reciprocal easement cannot be applied retroactively). The same is true of the fact that, after Annie Stewart's death, the remainder of the landlocked property was platted and subdivided as the Annie Stewart Subdivision.

situated lakefront lots when (1) the lakefront lots were part of a platted subdivision, and (2) the property was marketed by a real estate agent as a "restricted subdivision." *Evans*, 765 S.W.2d at 468-69. In addition, the court found it significant that the owners of the lakefront lots were given voting rights proportionate to their "front footage holdings on the 715 contour line" of the lake. Taken together, this evidence was sufficient to demonstrate the original grantor's intent that *all* the similarly situated lots (i.e., the lakefront lots), including those retained, were intended to be part of a plan of development of residential use only. The supreme court concluded, therefore, that the implied restrictive negative easement doctrine applied. Significantly, however, the supreme court did not impose the restriction on the landlocked hilltop lot also retained by the original grantor, as it was found not to be part of the plan of development that the evidence showed included only the lakefront lots. *Id*.[8]

Here, even if it could be inferred that A.K. Stewart and Annie Stewart did have some sort of general plan or scheme of noncommercial development, the record suggests that any such plan encompassed only the landlocked properties bounded by Chipmonk Road and did not include

---

[8] Other examples include *Collum v. Neuhoff*, 507 S.W.2d 920 (Tex. Civ. App.—Dallas 1974, no writ) (recording of plat, restricting of certain areas for residences and others for parks, streets, and common areas, and levying assessments against all lot owners for joint maintenance evidenced general plan or common scheme for development), and *Selected Lands Corp. v. Speich*, 702 S.W.2d 197 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.) (duly filed covenants and recorded plats showing residential lots and common areas evidenced general plan or common scheme for residential use). We also note that requiring more than the insertion of restrictive covenants into a number of individual deeds is consistent with the notion that the implied restrictive negative easement doctrine only applies to a third party who purchases the retained property from the original grantor with actual or constructive notice of the existence of those restrictions on the other properties included in the scheme or plan of development. *See Evans*, 765 S.W.2d at 466. The other evidence of a general scheme or plan is necessary to justify creating an exception to the fundamental rule that a person takes property subject only to the restrictions in his chain of title.

12

lakefront tracts such as the Harbor Ventures Property. In contrast to the landlocked lots, most of the conveyances of the lakefront tracts lacked restrictions on commercial use. It is also significant that the Dalton and McKenney property and the Brown property, along with the rest of the smaller landlocked lots conveyed by Annie Stewart prior to her death, lie above the 715' contour line of Lake Travis, a line that roughly follows Chipmonk Road. When A.K. and Annie Stewart acquired their land, it was subject to an inundation easement that gave the LCRA the right to overflow any portion of the property lying below the 670' contour line. In 1940, however, the LCRA acquired additional easements permitting them to inundate and overflow property lying below the 715' contour line. Therefore, any property below the 715' contour line—i.e., on the opposite side of Chipmonk Road from the landlocked properties—including the Harbor Ventures Property, could be inundated and overflowed by the LCRA.[9] We think it unlikely that A.K. and Annie Stewart would intend to include as part of a residential development property that was subject to an inundation easement. Such properties would seem better suited to uses that can accommodate fluctuating water levels and

---

[9] The Harbor Ventures Property conveyance includes the following:

**RESERVATION FROM AND EXCEPTION TO CONVEYANCE AND WARRANTY:**
. . . .

2.      Rights of the Lower Colorado River Authority to inundate and overflow any portion of the subject property lying below the 670' Mean Sea Level Contour Line and release of damages as set forth in instrument recorded in Vol. 608, page 48, Deed Records of Travis County, Texas;

3.      Rights of the Lower Colorado River Authority to inundate and overflow any portion of the subject property lying below the 715' Mean Sea Level Contour Line and release of damages as set forth in instrument recorded in Vol. 643, page 24, Deed Records of Travis County, Texas; . . . .

occasional inundation—uses such as marinas and waterfront campgrounds or other businesses that operate from floating docks.

Applying the doctrine with the appropriate "extreme caution," we conclude that the evidence of similar restrictions in a number of conveyances is legally insufficient to support a finding that the original grantors intended to inaugurate a scheme or plan of noncommercial development that included both the smaller landlocked properties and the larger lakefront properties. Even assuming the existence of some evidence of a general scheme or plan of noncommercial development, the evidence is legally insufficient to establish that A.K. Stewart and/or Annie Stewart intended that the Harbor Ventures Property be included in such scheme or plan. Therefore, we conclude that the trial court erred in determining that the Harbor Ventures Property is burdened by a restrictive covenant against commercial use by virtue of the implied restrictive negative easement doctrine. We sustain appellants' first issue.

### Scope of the easements

In their second and third issues, appellants contend that the trial court erred in construing the scope of the express easements over the Harbor Ventures Property. Specifically, appellants challenge the following finding of fact and conclusion of law:

> FFCL 25:    Pursuant to the terms of the Dalton-McKenney Easement, Tim Dalton and Sandra McKenney, and their heirs and assigns may:

A. Construct one or more roads and/or walkways on and across all or part of the Dalton-McKenney Easement Area.[10]

B. Cut the underbrush and trim the trees situated in the Dalton-McKenney Easement Area.

C. Do any act or place any thing on the Dalton-McKenney Easement Area that in any manner or way beautifies or improves the appearance of the Dalton-McKenney Easement Area, the Dalton-McKenney Property or the view of the Dalton-McKenney Easement Area from the Dalton-McKenney Property; such right includes the right to:

    i. Beautify and/or improve the appearance of the Dalton-McKenney Easement Area, the Dalton-McKenney Property or the view of the Dalton-McKenney Easement Area from the Dalton-McKenney Property by cutting down and removing dead, decaying, unsightly or rotting trees and vegetation and/or maintaining the natural vegetation on the Dalton-McKenney Easement Area.

D. Use the Dalton-McKenney Easement Area for any recreational purposes normally associated with the use and enjoyment of lakefront property.

Appellants also challenge finding of fact and conclusion of law 29, which states that Susan Brown and her heirs and assigns have identical rights with regard to the "Brown Easement Area" defined similarly as the portion of the Harbor Ventures Property lying directly across Chipmonk Road from

---

[10] Tracking the language of the easement, the trial court defined the "Dalton-McKenney Easement Area" as "the land lying immediately North and adjacent to the Dalton-McKenney Property and between the prolongations of the East and West boundary lines of the Dalton-McKenney Property and between said tract of land and the contour line which is 670 feet above mean sea level as established by the United States Geological Survey Bench Marks." This describes the portion of the Harbor Ventures Property lying directly across Chipmonk Road from the Dalton-McKenney lot, between Chipmonk Road and Lake Travis.

15

the Brown Tract, between Chipmonk Road and the lake. Appellants' complaints regarding these findings and conclusions are essentially that (1) construing the easements to permit Dalton and McKenney and Brown to use the entirety of the Harbor Ventures Property between each of their tracts and the lake imposes an undue burden on the servient estate and gives the easement holders rights not necessary to their ingress and egress to Lake Travis, which is the purpose of the easement, and (2) permitting Dalton and McKenney and Brown to use the entirety of the Harbor Ventures Property between each of their tracts and the lake for "any recreational purposes normally associated with the use and enjoyment of lakefront property" is beyond the scope of rights granted in the easement, which, again, was intended only to provide owners of the Dalton-McKenney Tract and the Brown Tract a means of ingress and egress to Lake Travis.

An easement is a nonpossessory interest in land that authorizes its holder to use the property for specified purposes only. *Marcus Cable Assocs., LP v. Krohn*, 90 S.W.3d 697, 700 (Tex. 2002) (citing Restatement (Third) of Property (Servitudes) § 1.2 cmt. d (2000)). Nothing passes by implication "except what is reasonably necessary" to fairly enjoy the rights expressly granted. *Coleman v. Forister*, 514 S.W.2d 899, 903 (Tex. 1974). Use of the easement to pursue a purpose not provided for in the grant is not permitted. *Marcus Cable*, 90 S.W.3d at 701; *Coleman*, 514 S.W.2d at 903. An easement's express terms, interpreted according to their generally accepted meaning, delineate the purposes for which the easement holder may use the property. *Marcus Cable*, 90 S.W.3d at 701 (citing *DeWitt Cnty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 103 (Tex. 1999)).

The contracting parties' intent, as expressed in the grant, determines the scope of the interest conveyed. *DeWitt Cnty.*, 1 S.W.3d at 103 (scope of easement holder's rights must be

16

determined by reference to terms of grant). When the grant's terms are not specifically defined, they should be given their plain, ordinary, and generally accepted meaning. *Marcus Cable*, 90 S.W.3d at 701; *DeWitt Cnty.*, 1 S.W.3d at 101. "[T]hose who grant easements should be assured that their conveyances will not be construed to undermine private-property rights—like the rights to 'exclude others' or to 'obtain a profit'—any more than what was intended in the grant." *Marcus Cable*, 90 S.W.3d at 702.

Basic principles of contract construction and interpretation apply when considering the terms of an express easement. *DeWitt Cnty.*, 1 S.W.3d at 100. In construing a written contract, our primary concern is to ascertain the true intentions of the parties as expressed in the instrument. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). Ordinarily, the writing alone is sufficient to express the parties' intentions because it is the objective, not subjective, intent that controls. *Matagorda Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex. 2006) (per curiam). We construe contracts from a utilitarian standpoint, bearing in mind the particular activity sought to be served. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005). We will avoid, when possible, a construction that is unreasonable, inequitable, or oppressive. *Id.*; *see also Lane v. Travelers Indem. Co.*, 391 S.W.2d 399, 402 (Tex. 1965) (unreasonable to conclude that parties to insurance contract intended its provisions to lead to absurd results).

Informed by these principles, we consider the terms of the easements at issue here. First and foremost, the language of the Dalton-McKenney Easement plainly states that its purpose is to provide "ingress and egress" from the Dalton-McKenney Tract to Lake Travis. The "ingress and egress" is across the Harbor Ventures Property, which is the "land lying immediately North and

17

adjacent to" the Dalton-McKenney Tract. The easement's location is described as "between prolongations of the East and West boundary lines of [the Dalton-McKenney Tract] and between [the Dalton-McKenney Tract] and the contour line which is 670 feet above mean sea level."



The terms of the easement therefore provide its holder with the right to cross the Harbor Ventures Property to access Lake Travis ("ingress and egress . . . to Lake Travis") and to do so at some place that is located "between the prolongations" of the east and west boundary lines of the Dalton-McKenney Tract. The trial court, however, found that Dalton and McKenney could construct roads on "all or part of" the portion of the Harbor Ventures Property lying directly north and adjacent to the Dalton-McKenney Tract—i.e., over the *entirety* of that portion of the Harbor Ventures Property—presumably because it read the easement as declaring the width of the right of way granted to encompass the entire area from the prolongation of the west boundary line to the prolongation of the east boundary line. The language of the express easement, however, simply provides that the holder has a right of ingress and egress to the lake at an unspecified location "between" these prolongations. Thus, they have the right to cross the Harbor Ventures Property to Lake Travis using a path or roadway that lies somewhere between those prolongations, as opposed to choosing some other route such as a less direct pathway that meanders onto portions of the Harbor Ventures Property not directly north of the Dalton-McKenney Tract.[11] The language of the easement does not, in our view, permit Dalton and McKenney to use the *entire* portion of the Harbor Ventures Property lying directly north of them and between the prolongations of their east and west boundary lines for ingress and egress to the lake.

The trial court's judgment defines the "Dalton-McKenney Easement Area" as "the land lying immediately North and adjacent to the Dalton-McKenney [Tract] and between

---

[11] For example, the easement's limits prevent the path from crossing over the portion of the Harbor Ventures Property lying directly north of the *Brown* Tract.

prolongations of the East and West boundary lines of the Dalton-McKenney [Tract] and between said tract of land and the contour line which is 670 feet above mean sea level" and declares that the Dalton-McKenney Easement "consists of all portions of the Dalton-McKenney Easement Area." While we agree that the trial court's judgment accurately described the area within which the easement may be located (the Dalton-McKenney Easement Area), we hold that the easement itself is limited to that portion of the described property reasonably required to permit the holder to accomplish the purpose of the easement—ingress and egress to the lake. *See Lakeside Launches, Inc. v. Austin Yacht Club, Inc.*, 750 S.W.2d 868, 871 (Tex. App.—Austin 1988, writ denied) ("Where the grant does not state the width of the right-of-way created, the grantee is entitled to a suitable and convenient way sufficient to afford ingress and egress to the owner of the dominant estate."). As in *Lakeside Launches*, we hold that the easement granted is no wider than reasonably necessary to afford Dalton and McKenney ingress and egress to the 670' contour line of Lake Travis.

Our holding comports with our practice of declining, when possible, to adopt a construction that is unreasonable, inequitable, and oppressive. If the Dalton-McKenney Easement were construed to encompass the entire portion of the Harbor Ventures Property north of the Dalton-McKenney Tract, it would be impractical, if not impossible, for the owner of the servient estate to use its property for any purpose other than as a waterfront park maintained for the benefit of the owners of the dominant estate. If, for example, it were to build any structure or place any thing on any part of this portion of the Harbor Ventures Property, it would risk being ordered to remove it as an obstruction of the easement. Moreover, such a broad construction of the easement is not required

20

to accomplish its purpose—ingress and egress to the lake—and would serve only to undermine private-property rights more than was intended in the grant.

The remaining question, then, is what is the precise location of the Dalton-McKenney Easement? The right to select the placement of an easement the precise location of which is not identified in the easement document belongs initially to the owner of the servient estate at the time the dominant estate is created. *Samuelson v. Alvarado*, 847 S.W.2d 319, 323 (Tex. App.—El Paso 1993, no pet.) (citing *Cozby v. Armstrong*, 205 S.W.2d 403, 407 (Tex. Civ. App.—Fort Worth 1953, writ ref'd n.r.e.)). If, as here, the servient owner fails to do so, then the owner of the dominant estate may locate the easement with due regard for the convenience of the parties. *See id.* (citing *Grobe v. Ottmers*, 224 S.W.2d 487, 489 (Tex. Civ. App.—San Antonio 1949, writ ref'd n.r.e.)).[12] Once established, the location of the easement cannot be changed by either the easement owner or the servient owner without the consent of both parties, even when use of the easement where located becomes detrimental to the use of the servient estate. *Id.* (citing *Meredith v. Eddy*, 616 S.W.2d 235, 240 (Tex. Civ. App.—Houston [1st Dist.] 1981, no writ); *Cozby*, 205 S.W.2d at 407). Dalton testified at trial that he and his father cut a roadway across the Harbor Ventures Property in the 1940s, and the family has used that roadway to access Lake Travis ever since.[13] This roadway, therefore, is the location of the Dalton-McKenney Easement as established by the owners of the dominant and servient estates, *see id.* (citing *Grobe*, 224 S.W.2d at 489) (location of easement may

---

[12] Although the *Samuelson* court was considering the location of an "easement by necessity," the principles are equally applicable to the present case, in which the precise location of an express easement is at issue.

[13] The record contains a survey that identifies the location of this roadway and an aerial photograph with the roadway highlighted.

21

be established by acquiescence of parties), and may not be changed without their mutual consent. The width of the easement is limited to what is reasonably necessary and convenient for ingress and egress to the 670' contour line of Lake Travis "and as little burdensome as possible to the servient owner." *See Coleman*, 514 S.W.2d at 903.

The same analysis applies to the trial court's declaration that the Brown Easement "consists of all portions of the Brown Easement Area."[14] This declaration overstates the width of the Brown Easement, which we conclude is likewise limited to that portion of the Brown Easement Area no wider than reasonably necessary to afford Brown ingress and egress to the 670' contour line of Lake Travis.

With respect to the location of the Brown Easement, there was testimony at trial that, when Brown purchased the property, there was a path leading from the Brown Tract, across the portion of the Harbor Ventures Property constituting the Brown Easement Area, to the lake.[15] We hold that this path is the location of the Brown Easement as established by the owners of the dominant and servient estates, *see id.* (citing *Grobe*, 224 S.W.2d at 489) (location of easement may be established by acquiescence of parties), and may not be changed without their mutual consent. The width of the easement is limited to what is reasonably necessary and convenient for ingress and

---

[14] The Brown Easement Area is defined as "the land lying immediately North and adjacent to the Brown Property and between the prolongations of the East and West boundary lines of the Brown Property and between said tract of land and the 670' Contour Line." This describes the portion of the Harbor Ventures Property lying directly across Chipmonk Road from the Brown Tract, between Chipmonk Road and Lake Travis.

[15] The record contains a photograph of the path from the Brown Tract to the lake.

22

egress to the 670' contour line of Lake Travis "and as little burdensome as possible to the servient owner." *See Coleman*, 514 S.W.2d at 903.

With the Dalton-McKenney Easement and the Brown Easement so defined, it follows that the activities permitted in the easements—including constructing roads and pathways, cutting underbrush, and doing any act or thing that beautifies or improves its appearance—may be conducted only on those easements, not on the entirety of the Dalton-McKenney Easement Area or the Brown Easement Area. The language of each easement provides:

> [T]he grantee, her heirs and assigns, shall have the right to construct roads and walkways, one or both or more of each, on and across *said land* and shall have the right to cut the underbrush and to trim the trees *situated thereon*, and to do any act or thing on *said land* which will in any wise beautify or improve the appearance of either the land across which said easement is granted or the tract of land above conveyed.

(Emphasis added.) The italicized terms above refer to the easement itself, i.e., the portions of the Harbor Ventures Property in front of each of the Dalton-McKenney and Brown tracts used for ingress and egress to the 670' contour line, not to the entire Dalton-McKenney Easement Area or the entire Brown Easement Area. Again, this construction of the easement language is consistent with construing the rights granted in the easement in the manner required to accomplish its purpose without undermining private-property rights more than was intended in the grant. *See Marcus Cable*, 90 S.W.3d at 702.

The trial court's judgment and findings of fact and conclusions of law also state that Dalton and McKenney and Brown have the right to beautify and improve "the view" of their respective easements. Nothing in the easement language contemplates improving any "views," and

23

the trial court erred by construing the Dalton-McKenney Easement and the Brown Easement to afford any such rights.

Appellants also challenge those portions of the trial court's judgment that enjoin them from ordering Dalton and McKenney or Brown, and/or their invited guests, to leave their respective easements. Appellants contend, and we agree, that the owner of the servient estate may prevent the owner of the dominant estate from making an unauthorized use of the easement—for example shooting guns or holding a bonfire. The owners of the easements may use them only for their authorized purpose—ingress and egress to the lake and the permitted ancillary activities such as cutting the underbrush or improving or beautifying the easement itself. The owners of the servient estate are not prohibited from ordering people off the easement if necessary to stop an unauthorized use. *See Stout v. Christian*, 593 S.W.2d 146, 151 (Tex. App.—Austin 1980, no writ) (affirming injunction prohibiting easement owners from cutting fences, leaving gates open, and committing other acts interfering with use of servient estate).

Finally, we address appellants' contention that the trial court erred in construing the easements to permit their use for "any recreational purposes normally associated with the use and enjoyment of lakefront property." Appellants contend that the right of ingress and egress to lakefront property does not entitle Dalton and McKenney and Brown to picnic, sunbathe, congregate, or install a boat dock "or do any activity other than simply to travel to and from the water across the defined portion of the Harbor Ventures Property above the 670' contour line." As previously noted, the easements' express terms delineate the purpose for which the easement holder may use the property. *Marcus Cable*, 90 S.W.3d at 702. "Nothing passes by implication 'except what is reasonably

24

necessary' to fairly enjoy the rights expressly granted." *Id.* (quoting *Coleman*, 514 S.W.2d at 903).

Thus, if a particular purpose is provided for in the grant, a use pursuing a different purpose is not permitted. *Id.* The easements at issue here unambiguously provide that the purpose of the easement is "ingress and egress" from the tract of land conveyed in the deed containing the easement to Lake Travis. Because the sole purpose stated in the deeds is for "ingress and egress," we cannot conclude that the express easements impliedly granted the right to use the property for general recreational purposes "normally associated with the use and enjoyment of lakefront property." *See Coleman*, 514 S.W.2d at 903 (easement for "ingress and egress" does not grant "right to linger for recreational purposes, or to exercise waterfront privileges"); *Cummins v. Travis Cnty. Water Control & Improvement Dist. No. 17*, 175 S.W.3d 34, 52 (Tex. App.—Austin 2005, pet. denied) (mooring boat dock on land over which one has easement for purposes of ingress and egress to lake not reasonably necessary to achieve rights expressly granted); *Lakeside Launches*, 750 S.W.2d at 869 (easement for purpose of ingress and egress does not convey right to anchor and float commercial boat dock); *Wall v. Lower Colo. River Auth.*, 536 SW.2d 688, 691 (Tex. Civ. App.—Austin 1976, writ ref'd n.r.e.) (right of ingress and egress across land retained by grantor does not grant implied right to build or maintain structures appropriate to lakefront property).[16] Dalton and McKenney's and Brown's use of their easements is therefore limited to activities reasonably necessary to enjoy

---

[16] Relying on her contention that the language of the easement gives her the right to do anything that beautifies the easement, Brown argues that she is entitled to engage in a very broad array of activities, including anchoring a floating boat dock. The sole purpose of the grant, however, is to provide "ingress and egress," and Brown's rights are limited to activities that reasonably further that purpose. Thus, whether a particular activity is permitted depends not on whether it beautifies the property, but on whether it is reasonably necessary to accomplish the purpose expressly granted—ingress and egress.

their right of ingress and egress to the 670' contour line of Lake Travis. *See Marcus Cable*, 90 S.W.3d at 702.

***Damages award***

In their fourth issue, appellants contend that the damages awards in favor of Dalton and McKenney and Brown are not supported by legally or factually sufficient evidence. Relying on *Hall v. Robbins*, Dalton and McKenney and Brown contended at trial that the proper measure of damages for the loss of use of their easements was the reasonable lease or rental value of the Harbor Ventures Property for the time period from June 2005 through trial. *See Hall v. Robbins*, 790 S.W.2d 417, 418 (Tex. App.—Houston [14th Dist.] 1990, no writ). The trial court awarded Dalton and McKenney $31,999.99 as damages for their loss of use of the Dalton-McKenney Easement and made an identical award to Brown for her loss of use of the Brown Easement. This figure was arrived at by dividing the amount of money Flagship Marine paid to lease the entire Harbor Ventures Property ($2,000 per month) by three (on the basis that each of the easements correlates to one-third of the Harbor Ventures Property) and multiplying by 48 (the number of months from June 2005 through trial). Appellants contend that this is not a proper measure of damages for loss of use of an easement and that, because there was no other evidence of damages, there was legally insufficient evidence presented at trial to support an award of damages.

The court's calculation of damages for temporary injuries to real estate should be tailored to the circumstances of the specific case. *See id.* at 418 (identifying several methods of calculating damages for temporary injuries). In *Hall*, the court considered the appropriate measure of damages when a landowner was prevented from accessing a piece of his vacant land due to a

26

blocked easement. The *Hall* court held that the proper measure of damages was the monetary loss to the owner caused by his inability to use the land that he could not access, which it determined was the lease value of that land. *Id.* at 419-20. In the present case, however, the parties seeking damages do not own the land they claim to have been prevented from using—the portion of the Harbor Ventures Property subject to the easement. They have no right to receive rentals from either the easement itself or the area they access using the easement (the 670' contour line of Lake Travis), nor do they have any right to use any part of the Harbor Ventures Property for any purpose beyond their ingress and egress to the 670' contour line of the lake. Awarding damages to Dalton and McKenney and Brown based on a use to which they could never have put the property is inappropriate. *See Etex Tel. Coop., Inc. v. Sanders*, 607 S.W.2d 278, 281 (Tex. Civ. App.—Texarkana 1980, no writ) (observing that proper measure of damages is one that compensates owner for his losses resulting from inability to use property for its normal purposes). Such an award would not compensate them for an actual loss, nor would it return them to the position they were in before the injury. There is no evidence in the record of the value to Dalton and McKenney and Brown of being able to access the 670' contour line or of any damages they suffered as a result of not having such access. We conclude that the awards of $31,999.99 in damages to Dalton and McKenney and to Brown are not supported by legally sufficient evidence. We sustain the fourth appellate issue. We need not reach appellants' argument that there was no legal basis for holding Rand Forest liable, jointly and severally with Harbor Ventures and Flagship Marine, for these damages.

**Attorneys' fees**

The trial court's judgment includes the following attorneys' fees awards:

27

A.    Plaintiffs Tim Dalton, Sandra McKenney, and Susan Brown have requested the Court award them costs and reasonable and necessary attorney's fees under Section 37.009 of the Texas Civil Practice and Remedies Code and Section 5.006(a) of the Texas Property Code.

B.    The Court finds that Plaintiffs Tim Dalton and Sandra McKenney's claims for declaratory judgment and for breach of restrictive covenant against Defendants are so interrelated that their prosecution or defense entails proof or denial of essentially the same set of facts.

C.    The Court finds that Plaintiffs Tim Dalton and Sandra McKenney have incurred reasonable and necessary attorneys fees in the amount of $83,000.00 related to the prosecution of the declaratory judgment claims.

D.    The Court also finds that award of such amount is equitable and just and orders that Plaintiffs Tim Dalton and Sandra McKenney recover reasonable and necessary attorney's fees in the amount of $83,000 from Defendants Harbor Ventures, Inc., Flagship Marine Corporation, and Rand K. Forest d/b/a Shoreline Development, jointly and severally.

The judgment includes similar provisions awarding attorneys' fees in the amount of $42,000 to Brown. In their fifth issue, appellants claim the attorneys' fee awards were improper because neither Brown nor Dalton and McKenney "allocated their attorneys [fees] attributed to defending Harbor Ventures' counterclaim for a declaration that the Easements' northern boundary is the 670' contour versus their other claims" and "were not the prevailing party on such claim." Appellants also request that in the event this Court reverses the judgment regarding the scope of the easements or the imposition of an implied reciprocal negative easement, we also reverse the attorneys' fee awards.

The trial court awarded Dalton and McKenney and Brown attorneys' fees for prosecuting their declaratory judgment claims pursuant to section 37.009 of the Uniform Declaratory Judgments Act (UDJA). *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (West 2008). Section 37.009 provides: "In any proceeding under this chapter, the court may award costs and reasonable

28

and necessary attorney's fees as are equitable and just." *Id.* In a declaratory judgment action, the trial court may award *either side* costs and reasonable attorneys' fees. *See Arthur M. Deck & Assocs. v. Crispin*, 888 S.W.2d 56, 62 (Tex. App.—Houston [1st Dist.] 1994, writ denied).

When a declaratory judgment is reversed on appeal, however, the award of attorneys' fees may no longer be equitable and just. *See Sava Gumarska In Kemijska Industria D.D. v. Advanced Polymer Sciences, Inc.*, 128 S.W.3d 304, 324 (Tex. App.—Dallas 2004, no pet.). While we are not required to do so, when we reverse a declaratory judgment and the trial court awarded attorneys' fees to the party who prevailed at trial, we may remand the attorneys' fee award for reconsideration in light of our disposition on appeal. *Id.* In the present case, our substantial modification of the trial court's judgment may affect whether the award of attorneys' fees is equitable and just. *See id.*; *see also Barshop v. Medina Cnty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 637 (Tex. 1996). Although the trial court's award of attorneys' fees may not have been an abuse of its discretion, the court might exercise its discretion differently in light of our opinion, which significantly alters the declaratory relief granted. Therefore, we reverse the award of attorneys' fees to Dalton and McKenney and Brown. We remand the issue of whether to award attorneys' fees under the declaratory judgments act, to whom any such fees may be awarded, and the reasonable and necessary amount of any such attorneys' fees, if awarded, to the trial court for further proceedings. Tex. R. App. P. 44.1(b).

## CONCLUSION

For the reasons set forth in this opinion, we reverse the trial court's judgment that, by application of the implied reciprocal negative easement doctrine, the Harbor Ventures Property

29

is burdened by a restrictive covenant prohibiting the operation of a commercial enterprise on the property, and we render judgment that no such implied restrictive covenant applies to the Harbor Ventures Property. We therefore set aside the portion of the trial court's judgment enjoining the operation of a commercial enterprise on the Harbor Ventures Property. We reverse the trial court's award of damages to Dalton and McKenney and Brown for loss of use of their easements and render judgment that they take nothing by those claims. We reverse the trial court's award of attorneys' fees and remand that issue to the trial court for further proceedings. We modify the trial court's judgment as follows: (1) section II.B of the judgment is modified to state: "The Dalton-McKenney Easement consists of that portion of the Dalton-McKenney Easement Area reasonably necessary to provide ingress and egress from the Dalton-McKenney Property to the 670' contour line of Lake Travis"; (2) section III.B is modified to state: "The Brown Easement consists of that portion of the Brown Easement Area reasonably necessary to provide ingress and egress from the Brown Property to the 670' contour line of Lake Travis"; (3) sections II.C.1-4 and sections II.E.1-6 are modified to replace the words "Dalton-McKenney Easement Area" with the words "Dalton-McKenney Easement"; (4) sections III.C.1-4 and sections III.E.1-6 are modified to replace the words "Brown Easement Area" with the words "Brown Easement"; (5) sections II.C.3, II.E.4, and II.E.6 are modified to delete the words "or the view of the Dalton-McKenney Easement Area from the Dalton-McKenney Property"; (6) sections III.C.3, III.E.4, and III.E.6 are modified to delete the words "or the view of the Brown Easement Area from the Brown Property"; (7) sections II.E.3. and III.E.3 are deleted in their entirety; and (8) sections II.C.4 and III.C.4 are deleted in their entirety.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justices Jones, Justices Pemberton and Henson

Modified and, as Modified, Affirmed in Part; Reversed and Rendered in Part; and Reversed and Remanded in Part

Filed:   May 18, 2012