# IN THE SUPREME COURT OF TEXAS

═══════════

No. 18-0768

═══════════

SOUTHWESTERN ELECTRIC POWER COMPANY, PETITIONER,

v.

KENNETH LYNCH, TOMMY BATCHELOR, AND TWANT WILSON, RESPONDENTS

═══════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE SIXTH DISTRICT OF TEXAS

═══════════════════════════════

**Argued December 5, 2019**

JUSTICE GREEN delivered the opinion of the Court.

JUSTICE BLAND did not participate in the decision.

This dispute centers on the width of several general easements that an electric company acquired from the respondent landowners' predecessors-in-title in 1949. The petitioner electric company argues that the easements are general easements with no fixed width, while the landowners contend that the easements should have a fixed, thirty-foot width. After conducting a bench trial, the trial court concluded that the easements are fixed at a thirty-foot width, and therefore the trial court rendered judgment for the landowners. The court of appeals affirmed the trial court's judgment, concluding that because the original 1949 easements did not specify a width, the trial court was within its discretion to admit extrinsic evidence of past use to determine how much of the

landowners' land "was reasonably necessary" for the petitioner to utilize pursuant to the easements. 581 S.W.3d 292, 304–06 (Tex. App.—Texarkana, pet. granted). We disagree with the court of appeals and conclude that the easements have no fixed width, but the petitioner's use of the land under the easements nevertheless must be reasonable and necessary. We reverse in part the judgment of the court of appeals and render judgment for the petitioner.

## I. Background

In 1949, Southwestern Gas & Electric Company (Southwestern) acquired a number of easements over a stretch of land in northeast Texas to construct a transmission line. Pursuant to the easements, Southwestern constructed a wooden-pole transmission line in 1949 that crossed the encumbered properties. Southwestern Electric Power Company (SWEPCO) subsequently acquired these easements. The easements authorize SWEPCO "to erect towers, poles and anchors along" a set course on a right-of-way that traverses several privately owned properties. In addition, these easements grant SWEPCO the right to ingress and egress over the encumbered properties "for the purpose of constructing, reconstructing, inspecting, patrolling, hanging new wires on, maintaining and removing said line and appurtenances." The easements limit the number of poles, towers, and anchors that SWEPCO may construct on the properties, but also give SWEPCO the option to increase the number of poles, towers, or anchors by compensating the landowners. Since acquiring the easements from Southwestern, SWEPCO has continued to utilize the easements to maintain the transmission line following the same general path since the line's construction.

Kenneth Lynch, Tommy Batchelor, and Twant Wilson (collectively, the Landowners) purchased land encumbered by the 1949 easements in different transactions that took place from

2

1986 to 2007. In 2014 and 2015, SWEPCO undertook a modernization project on the original transmission line. This modernization project included replacing the line's wooden poles with steel poles. As part of the modernization project, SWEPCO made offers to many of the landowners whose properties were encumbered by the 1949 easements to supplement the easements to "bring the rights and restrictions to SWEPCO's standard right of way requirements." Specifically, the supplemental terms to the 1949 easements included additional rights for SWEPCO and proposed setting the easements' width at 100 feet. SWEPCO offered landowners $1,000 if they accepted the supplemental terms. Some of those landowners accepted SWEPCO's proposal, but the Landowners did not. SWEPCO therefore proceeded to complete the modernization project on the Landowners' properties under the original, unamended terms of the 1949 easements.

Over the course of the modernization project, the Landowners did not object to SWEPCO's utilization of the 1949 easements to access their encumbered properties to upgrade the transmission line. After the project was completed, however, the Landowners filed suit seeking a declaratory judgment fixing SWEPCO's easements to a thirty-foot width, fifteen feet on each side of the transmission line. The Landowners argued that SWEPCO has only ever utilized thirty feet of the encumbered properties, and thirty feet should be the maximum amount of land that SWEPCO may utilize in the future. The Landowners were concerned that SWEPCO may, in the future, utilize more than triple the amount of land it has used in the past. In support of this contention, the Landowners pointed to SWEPCO's offer to supplement the easements with a 100-foot fixed width as evidence that SWEPCO intends to one day utilize the easement more than it has in the past.

3

In response to the Landowners' suit for declaratory judgment, SWEPCO filed two pleas to the jurisdiction, arguing that the Landowners had not suffered any injury, and therefore their claims were not justiciable. The trial court denied SWEPCO's pleas to the jurisdiction. SWEPCO also filed counterclaims against the Landowners for trespass and breach of contract. SWEPCO ultimately nonsuited these counterclaims before trial.

The trial court held a bench trial on the Landowners' declaratory judgment claim. At trial, the court admitted—over SWEPCO's repeated objections—extrinsic evidence showing SWEPCO's historical use of the easements, which the Landowners offered in support of their argument that the easements should have a thirty-foot width. SWEPCO meanwhile maintained that it possesses general easements over the Landowners' properties, and the easements are not limited to a specific width but instead give SWEPCO the right to access the properties as much as is reasonably necessary for the purposes specified in the easements. SWEPCO also asserted that it has no plans to expand its use of the easements.

At the conclusion of the bench trial, the trial court entered findings of fact and conclusions of law. The trial court found that SWEPCO "utilized, operated and maintained the transmission line within a thirty (30) foot easement subsequent to the 2014-2015 rebuild and modernization of the transmission line." The trial court also found that a "thirty (30) foot easement is reasonably necessary for the operation, use and maintenance of the transmission line across [the Landowners'] respective properties." Accordingly, the trial court concluded that SWEPCO's easements are limited to fifteen "feet on each side of the center point of the transmission line, amounting to a thirty (30)

4

foot utility easement" on the Landowners' properties. The trial court also awarded the Landowners attorneys fees and costs.

On appeal, SWEPCO argued that the trial court lacked subject matter jurisdiction over the suit because there was no justiciable controversy. Specifically, SWEPCO argued that the Landowners have not alleged that SWEPCO used the easements in an unreasonable manner or beyond what was reasonably necessary. As for the trial court's conclusion that the easements have a fixed, thirty-foot width, SWEPCO argued that the 1949 easements are express general easements containing unambiguous language, and the trial court erred in admitting the Landowners' extrinsic evidence to write new terms into the easements. The court of appeals held that the trial court was correct to conclude that it had subject matter jurisdiction over the dispute because SWEPCO might choose to use its interpretation of the 1949 easements to "oppose the [Land]owners' future usage" of their properties. 581 S.W.3d at 302 (citation omitted). The court of appeals also pointed to SWEPCO's trespass counterclaim, even though this counterclaim was nonsuited, as evidence that the dispute between SWEPCO and the Landowners presented the trial court with a justiciable controversy. *Id.* In addressing SWEPCO's argument on the merits, the court of appeals concluded that the 1949 easements described "a framework or skeleton of the easement[s] conveyed without describing [the easements'] width, [and] the trial court could resort to extrinsic evidence in order to determine the width of the easement[s]." *Id.* at 304 (citation omitted). The court of appeals reasoned that "SWEPCO's interpretation of the 1949 [easements] would result in 'growing' easement[s]," and "once SWEPCO built and maintained the transmission lines, its rights [under the easements] became fixed and certain." *Id.* at 306. Accordingly, the court of appeals concluded that

5

the trial court acted within its discretion to admit extrinsic evidence to determine "that a thirty-foot easement is reasonable and necessary." *Id.* The court of appeals affirmed the trial court's judgment. *Id.*

## II. Standard of Review

We review questions of subject matter jurisdiction de novo. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). Ripeness is a component of subject matter jurisdiction that focuses on a lawsuit's timing. *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 851 (Tex. 2000) ("While standing focuses on the issue of *who* may bring an action, ripeness focuses on *when* that action may be brought."). Because a case must be ripe in order for the trial court to have subject matter jurisdiction, we review a trial court's ripeness determination de novo. *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998) ("[R]ipeness is a legal question subject to de novo review . . . .") (citations omitted).

If a case proceeds to a bench trial and the trial court enters findings of fact and conclusions of law, appellate courts defer to the trial court's findings of fact—so long as they are supported by the record—and reviews conclusions of law de novo. *Reliance Nat'l Indem. Co. v. Advance'd Temps., Inc.*, 227 S.W.3d 46, 50 (Tex. 2007) ("Appellate courts review legal determinations de novo, whereas factual determinations receive more deferential review based on the sufficiency of the evidence."); *see also MBC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002) (citation omitted) ("The appellant may not challenge a trial court's conclusions of law for factual insufficiency; however, the reviewing court may review the trial court's legal conclusions drawn from the facts to determine their correctness.").

## III. Analysis

### A. SWEPCO's Pleas to the Jurisdiction

The first issue we must address is whether the court of appeals erred in concluding that the trial court had subject matter jurisdiction over the Landowners' declaratory judgment suit. SWEPCO argued in the courts below that there was no justiciable controversy, and therefore the trial court lacked subject matter jurisdiction. Specifically, SWEPCO argued that the Landowners complained about future events that have not yet occurred, such as the possibility that SWEPCO will cut down vegetation on the Landowner's properties. The court of appeals rejected SWEPCO's arguments and held that "even though the differences between the parties as to their legal rights have not reached the state of an actual controversy," the case presents the "ripening seeds of a controversy." 581 S.W.3d at 302 (quoting *Trinity Settlement Servs., LLC v. Tex. State Sec. Bd.*, 417 S.W.3d 494, 506 (Tex. App.—Austin 2013, pet. denied)) (citations omitted). Therefore, the court of appeals concluded that the trial court had subject matter jurisdiction. *Id.*

For a court to have subject matter jurisdiction over a case, the plaintiff's claims must be ripe. *Mayhew*, 964 S.W.2d at 928. "Ripeness, like standing, is a threshold issue that implicates subject matter jurisdiction . . . , and like standing, emphasizes the need for a concrete injury for a justiciable claim to be presented." *Patterson v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 971 S.W.2d 439, 442 (Tex. 1998) (citations omitted). In determining whether a case is ripe, the focus is on whether "the facts are sufficiently developed 'so that an injury has occurred or is likely to occur, rather than being contingent or remote.'" *Gibson*, 22 S.W.3d at 851–52 (quoting *Patterson*, 971 S.W.2d at 442). If the plaintiff's claimed injury is based on "hypothetical facts, or upon events that have not

7

yet come to pass," then the case is not ripe, and the court lacks subject matter jurisdiction. *Id.* (citation omitted).

A plaintiff bringing suit under the Uniform Declaratory Judgments Act (UDJA) must still properly invoke the trial court's subject matter jurisdiction. *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993) (citations omitted) (explaining that the UDJA is a "procedural device for deciding cases already within a court's jurisdiction" and does not permit courts to render advisory opinions). The UDJA provides that "[a] person interested under a deed . . . may have determined any question of construction or validity arising under the instrument . . . and obtain a declaration of rights, status, or other legal relations thereunder." TEX. CIV. PRAC. & REM. CODE § 37.004(a). As the court of appeals correctly pointed out, the UDJA does not authorize a court to decide a case in which the issues are hypothetical or contingent—the dispute must still involve an actual controversy. 581 S.W.3d 292 at 300 (citing *Empire Life Ins. Co. of Am. v. Moody*, 584 S.W.2d 855, 858 (Tex. 1979)).

The Landowners argue that they presented the trial court with a ripe, justiciable controversy. The controversy, according to the Landowners, is the competing interpretations of the meaning of the 1949 easements. The Landowners suggest that SWEPCO views the easements as "blanket easements," which allow SWEPCO to utilize as much of the Landowners' properties as it deems necessary, including land on which one of the Landowners' homes is located. In further support of its position that this case presents a justiciable controversy, the Landowners point to the fact that SWEPCO filed counterclaims arguing that the Landowners encroached on SWEPCO's rights under

8

its easements. In sum, a justiciable controversy exists, according to the Landowners, because they are uncertain how much of their properties are burdened by SWEPCO's easements.

SWEPCO, on the other hand, maintains that the Landowners allege only a hypothetical future controversy—not a dispute ripe for judicial review. SWEPCO contends that the court of appeals erred in concluding that the controversy here "manifests the presence of ripening seeds of a controversy" and that this is not enough to satisfy the ripeness requirement and invoke the trial court's subject matter jurisdiction. 581 S.W.3d at 303. Instead, SWEPCO argues that the Landowners' suit for declaratory judgment is based entirely on a hypothetical injury. According to SWEPCO, this case lacks the facts necessary to resolve the Landowners' claim because SWEPCO has general easements over the Landowners' properties and is permitted to use the easements in whatever manner is reasonably necessary. Because there is no evidence that SWEPCO's use of the easements is unreasonable and unnecessary at this time, and there is no evidence that SWEPCO intends to utilize the easements in an unreasonable and unnecessary way in the future, SWEPCO asserts that there is no justiciable controversy for the courts to resolve.

While it may be true that many of the Landowners' concerns stem from SWEPCO's possible future use of the easements, their claims are inextricably tethered to a present disagreement between the parties over the easements' scope. SWEPCO maintains that the easements are general easements with no fixed width, while the Landowners argue that the easements' width is fixed to SWEPCO's historical thirty-foot use. The Landowners' argument that SWEPCO's utilization of 100 feet of the easements would interrupt their use and enjoyment of structures on their property further indicates that there is indeed a live controversy in this case. The Landowners assert that they are unsure what

9

portions of their land they can utilize without fear of SWEPCO's encroachment on their use and enjoyment of the land. Notwithstanding the fact that SWEPCO nonsuited its breach of contract and trespass counterclaims, SWEPCO's allegation that the Landowners were encroaching on their easements underscores the controversy in this case: divergent interpretations of the 1949 easements.

In determining whether a suit for a declaratory judgment presents a court with a ripe controversy, we have explained that "the declaration sought must actually resolve the controversy." *Brooks v. Northglen Ass'n*, 141 S.W.3d 158, 164 (Tex. 2004) (citations omitted). But we have acknowledged that UDJA suits are often brought with an eye to future harm. *See Cobb v. Harrington*, 190 S.W.2d 709, 713 (Tex. 1945) (describing the UDJA "as a speedy and effective remedy for the determination of the rights of the parties when a real controversy has arisen and even before the wrong has actually been committed"). To be sure, the often future-looking nature of UDJA suits does not remove the requirement that the court must have subject matter jurisdiction over the suit—that is, that the parties must have standing, and a ripe, justiciable controversy must exist. *See City of Dall. v. Albert*, 354 S.W.3d 368, 378 (Tex. 2011) (citations omitted) ("[T]he DJA does not enlarge a court's jurisdiction; it is a procedural device for deciding cases already within a court's jurisdiction."). A plaintiff may very well present a court with a justiciable controversy when the plaintiff asserts that a live controversy exists and harm will occur if the controversy is left unresolved. *See Etan Indus., Inc. v. Lehmann*, 359 S.W.3d 620, 624 (Tex. 2011) (citation omitted) ("[The UDJA] is intended as a means of determining the parties' rights when a controversy has arisen but before a wrong has been committed . . . .").

10

The controversy here is the scope of SWEPCO's 1949 easements. Even if SWEPCO has not utilized its easements beyond the thirty feet the Landowners claim is the easements' fixed width, there remains a dispute over how much of the Landowners' land SWEPCO is entitled to utilize pursuant to the easements. That dispute is not merely academic or theoretical. Indeed, the Landowners contend that they "face <u>current</u> opposition in the usage of their properties in light of SWEPCO's claims" to its rights under the easements. In fact, the Landowners worry that SWEPCO could use its easements to destroy existing structures on the Landowners' properties. One of the Landowners testified at trial that he received a letter from SWEPCO listing a cost estimate to bulldoze the Landowner's house and all the other buildings on the property. The Landowner testified that this letter from SWEPCO was inconsistent with the Landowner's understanding of SWEPCO's rights under the 1949 easements, and that he needed a determination from the court as to how much of his land SWEPCO may utilize under the easements. Without such a determination, the Landowner testified that he does not know where on his property he can build structures.

We have explained that "[a] declaratory judgment is appropriate only if a justiciable controversy exists as to the rights and status of the parties and the controversy will be resolved by the declaration sought." *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995) (citing *Tex. Air Control Bd.*, 852 S.W.2d at 446). And in order "[t]o constitute a justiciable controversy, there must exist a real and substantial controversy involving genuine conflict of tangible interests and not merely a theoretical dispute." *Id.* (citations omitted). Here, a real and substantial controversy exists: SWEPCO maintains that the easements have no fixed width—the width could be at least 100 feet, according to SWEPCO—while the Landowners maintain that the easements

11

have a fixed, thirty-foot width. Indeed, SWEPCO asserted counterclaims of trespass and breach of contract, alleging that the Landowners encroached on SWEPCO's rights under the easements. While SWEPCO later nonsuited these counterclaims, the counterclaims underscore that a controversy exists between the Landowners and SWEPCO. And this controversy involves a "genuine conflict of tangible interests"—that is, SWEPCO's interest in utilizing the easements for the transmission line and the Landowners' interests in utilizing their properties. *Id.* Accordingly, the court of appeals did not err in concluding that a justiciable controversy exists between SWEPCO and the Landowners, and the trial court possessed subject matter jurisdiction over the Landowners' UDJA suit.

### B. The Scope of SWEPCO's Easements

Having determined that the Landowners properly invoked the trial court's subject matter jurisdiction to resolve the controversy over the meaning of the 1949 easements, we now turn to whether the court of appeals erred in concluding that the trial court was permitted to define the width of SWEPCO's easements at thirty feet. When construing the terms of an easement, courts deploy the rules of contract interpretation and look to the easement's express terms to determine its scope. *DeWitt Cty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999) (citations omitted) ("The rules of contract construction and interpretation apply to easement agreements. When a court concludes that contract language can be given a certain or definite meaning, then the language is not ambiguous, and the court is obligated to interpret the contract as a matter of law."). As in contract interpretation cases, courts look to all of the language in the easement and harmonize its terms to give effect to all of the provisions. *See id.* at 101 (looking to multiple portions of an easement to

12

give effect to the agreement's intent). If the easement's terms can be given a definite or certain meaning, "then the language is not ambiguous, and the court is obligated to interpret the contract as a matter of law." *Id.* at 100. Importantly, a dispute over the meaning of the easement's terms is not enough to render an easement ambiguous. *Id.* (citing *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex.1994)). An easement is ambiguous only if it is susceptible to two different, reasonable meanings. *Id.*

> The language in the SWEPCO easements grants:
>
> an easement or right-of-way for an electric transmission and distributing line, consisting of variable numbers of wires, and all necessary or desirable appurtenances (including towers or poles made of wood, metal or other materials, telephone and telegraph wires, props and guys), at or near the location and along the general course now located and staked out by the said Company over, across and upon the following described lands . . . .
>
> Together with the right of ingress and egress over [the Landowners' predecessors-in-title's] adjacent lands to or from said right-of-way for the purpose of constructing, reconstructing, inspecting, patrolling, hanging new wires on, maintaining and removing said line and appurtenances; the right to remove from said lands all trees (fruit trees excepted) and parts thereof, or other obstructions, which endanger or may interfere with the efficiency of said line or its appurtenances; and the right of exercising all other rights hereby granted. . . .

In sum, the plain language of the easements grants SWEPCO (1) a right-of-way on the Landowners' properties on which SWEPCO may construct a transmission line along a particular course; and (2) the right of ingress and regress over the Landowners' properties adjacent to the right-of-way for the purpose of constructing, removing, reconstructing, and maintaining the transmission line. The easements do not state a specific maximum width of the right-of-way, nor do the easements specify how much of the land SWEPCO is entitled to access under the ingress and egress provision.

13

SWEPCO maintains—and its representatives testified at trial—that this plain language grants SWEPCO what is known as a "general easement." General easements, SWEPCO argues, entitle the company to access, in a reasonable manner, as much of the Landowners' properties as is reasonably necessary to maintain the transmission line.

The first point of disagreement regarding the construction of the easements is whether the trial court erred in admitting extrinsic evidence to discern the easements' scope. SWEPCO argues that the easements "purposefully and unambiguously impose no specific, fixed limitation" of the easements' width, and therefore the trial court inappropriately considered extrinsic evidence showing SWEPCO's historical use of the easements to add a thirty-foot width to the easements. SWEPCO contends that the omission of any specific width of the easements was a deliberate and purposeful decision that the signatories to the easements made in 1949. In support of its position, SWEPCO points to the common use of general easements that lack specific widths as necessary tools that allow utility companies to acquire flexible easements that account for growth and change in the transmission lines. Indeed, as SWEPCO observes, the language in the 1949 easements authorizes SWEPCO to accommodate possible changes in technology that might require the installation of poles made from different material as well as the addition of more poles. Because the general nature of the easements was deliberate—not ambiguous—SWEPCO argues that the trial court and the court of appeals erred in fixing the easements' width at thirty feet based on the Landowners' extrinsic evidence showing SWEPCO's historical use of the easements.

Instead of construing the easements as general easements that intentionally omitted a defined width, the courts below concluded that once Southwestern constructed the transmission line in 1949

14

pursuant to the easements, its rights—and therefore SWEPCO's rights—under the easements became "fixed and certain," and based on SWEPCO's historical use of the land, a thirty-foot wide easement is what is reasonably necessary. 581 S.W.3d at 306. The court of appeals relied on *Houston Pipe Line Co. v. Dwyer*, 374 S.W.2d 662, 666 (Tex. 1964), for its conclusion that "once the location of the easement is selected by the grantee, its rights then become fixed and certain." 581 S.W.3d at 305. The easement in *Dwyer* was for the limited purpose of "laying, constructing, maintaining, operating and repairing a pipeline." 374 S.W.2d at 665. Like SWEPCO's easements, the *Dwyer* easement did not state a fixed width. *Id.* at 663. The plaintiffs in *Dwyer* sought to prevent the defendant pipeline company from enlarging an eighteen-inch pipe to a thirty-inch pipe. *Id.* The plaintiffs argued that once the eighteen-inch pipe was installed, the defendant could not replace the pipe with one nearly double the size under the same easement. *Id.* The Court in *Dwyer* concluded that the parties who negotiated the easement for $32.00 could not have intended to create an easement that "might be enlarged over and over again as often as an increase in demands for gas might make it necessary." *Id.* at 666 (citation omitted). The Court also pointed to the limited nature of the easement, which only authorized the "laying, constructing, maintaining, operating and repairing of a pipeline." *Id.* at 665. Accordingly, the Court concluded that once the defendant installed the eighteen-inch pipe, its rights became fixed and certain, and the defendant was not permitted to install a thirty-inch pipe pursuant to the existing easement. *Id.* at 666.

In reaching its decision, the Court distinguished the facts in *Dwyer* from the facts in *Knox v. Pioneer Natural Gas Co.*, 321 S.W.2d 596 (Tex. App.—El Paso 1959, writ ref'd n.r.e.), a case that SWEPCO cites to support its argument that the court of appeals erred in fixing the easements' width

15

at thirty feet. The primary distinction the Court drew was that the easement in *Knox* "clearly gave the grantee a right in excess of the one actually used," while the more limited language in *Dwyer* could not "be construed to permit the grantee a right in excess of the right actually used." *Dwyer*, 374 S.W.2d at 665. In *Knox*, a pipeline company obtained an easement over the plaintiffs' land that included a right-of-way

> of sufficient width to permit the grantee to lay, maintain, operate and remove a pipe line for the transportation of gas . . . together with free ingress, egress, and regress to and for the said grantee, and his or its agents, employees, workmen and representatives, as by it, he or them shall be necessary or convenient, at all times and seasons forever, in, along, upon and across said way, in common with the grantors, their tenants and assigns.

321 S.W.2d at 598. In response to an increase in the demand for gas, the defendant pipeline company replaced an old pipeline with a new, larger capacity line. *Id.* at 599. In concluding that the pipeline company was not limited to the old line under the terms of the easement, the court of appeals explained that "if the language of the grant clearly gives the grantee a right in excess of the one actually used, such right would still exist notwithstanding the exercise of a lesser privilege." *Id.* at 600. The court noted that express easements by conveyance are, by their very nature, forward-looking. *Id.* at 601. And when easements are negotiated between two parties, it is "assumed that the parties contemplated changes in the use of the servient tenant by the normal development in the use of the dominant tenament." *Id.* (citation omitted). The court of appeals reasoned that because there was no limitation in the easement about the size of the pipe, the defendant did not trespass by installing a new pipe, using as little of the land as was reasonably necessary. *Id.* at 602. Accordingly, the court concluded that because "[e]very easement carries with it the right to do

16

whatever is reasonably necessary for the full enjoyment of the easement itself," and because the replacement of the new pipe was reasonably necessary, the plaintiffs were not entitled to a court-ordered limitation on the easement when one was never contemplated by the parties who negotiated the easement. *Id.* at 601–02.

SWEPCO's easements bear significant similarities to the easement in *Knox*. The easements in both cases authorized the grantee the right to construct, maintain, repair, and improve a utility line—a pipeline in *Knox* and a transmission line in the present case. *Id.* at 598. In addition, the easements granted the rights of ingress and egress as necessary to access the right-of-way. *Id.* In rejecting SWEPCO's argument that the trial court was not permitted to affix a width to the easements, the court of appeals purported to distinguish the present case from *Knox* on the basis that the rule in *Knox* "has only been applied to easements which also grant an express right to lay additional lines in the future." 581 S.W.3d at 305 (citations omitted). But, as SWEPCO points out, its easements *do* grant SWEPCO the express right to lay additional lines in the future. The easements authorize SWEPCO to construct a transmission line with "variable numbers of wires, and all necessary or desirable appurtenances (including towers or poles made of wood metal or other materials . . .)" and further state that SWEPCO has the rights of ingress and egress "for the purpose of constructing, *reconstructing*, inspecting, patrolling, hanging new wires on, maintaining and removing said line and appurtenances." (emphasis added). This language contemplates future construction and installation of new poles and additional lines, providing an even clearer expression of SWEPCO's right than the easement in *Knox* provided. As a result, SWEPCO's easements are distinguishable from the easement in *Dwyer*, which did not include such broad, forward-looking

17

language and did not describe a path for the line. *See* 374 S.W.2d at 663 ("[T]he agreement does not prescribe metes and bounds for the easement, nor does it define a course or direction for the pipe to follow across the land.").

Notwithstanding the broad, forward-looking language in SWEPCO's easements, and the lack of a fixed width, the Landowners maintain that once Southwestern utilized the easements to construct the transmission line and establish a thirty-foot right-of-way in 1949, SWEPCO's rights as to how much of the Landowners' properties it could utilize became fixed at thirty feet. In support of this argument, the Landowners couch the easements in the same terms as the court of appeals: that these easements created a "framework or skeleton," and extrinsic evidence was needed to define the easements' width. 581 S.W.3d at 304. But the lack of a specified width in an easement does not mandate the admission of extrinsic evidence to prescribe a width—doing so obviates the flexibility that general easements afford the parties who bargained for the terms of an express general easement.

Indeed, this Court has recognized the existence of general easements that do not require a fixed width. As the Court explained in *Coleman v. Forister*, 514 S.W.2d 899 (Tex. 1974), "[a] grant or reservation of an easement in general terms implies a grant of unlimited reasonable use such as is reasonably necessary and convenient and as little burdensome as possible to the servient owner." *Id.* at 903. The Court recently reaffirmed this principle of easement construction in *Severance v. Patterson*, 370 S.W.3d 705, 721 (Tex. 2012). Consistent with the recognition of general easements in Texas, courts have long been reluctant to write fixed widths into easements when the parties to the easements never agreed to a particular width. *See, e.g.*, *Knox*, 321 S.W.2d at 601 (rejecting an

18

attempt to limit a pipeline company to the size of the original pipe installed pursuant to an easement, because there was no limitation in the easement on the size of pipe that could be installed, and the easement contemplated the need for an updated pipe in the future); *Crawford v. Tenn. Gas Transmission Co.*, 250 S.W.2d 237, 239–41 (Tex. App.—Beaumont 1952, writ ref'd) (refusing to limit a gas company's use of land for a pipeline to a fifty-foot strip, because the easement did not specify a width); *Lone Star Gas Co. v. Childress*, 187 S.W.2d 936, 940 (Tex. Civ. App.—Waco 1945, no writ) (refusing to confine an easement to a thirty-foot strip of land when the easement did not specify a width).

We see no reason to disturb this Court's and the courts of appeals' long-standing treatment of general easements in Texas. The starting point of any exercise in easement construction is the same as for contract interpretation: the easement's plain language. *See Marcus Cable Assocs., L.P. v. Krohn*, 90 S.W.3d 697, 700 (Tex. 2002) (citations omitted) ("We apply basic principles of contract construction and interpretation when considering an express easement's terms."). If the easement's terms are ascertainable and can be given legal effect, courts will not supplant the easement's express terms with additional terms nor consult extrinsic evidence to discern the easement's meaning. *See Am. Mfrs. Mut. Ins. Co. v. Schaefer,* 124 S.W.3d 154, 161–62 (Tex. 2003) (discussing, in the contract context, that courts "may neither rewrite the parties' contract nor add to its language") (citing *Royal Indem. Co. v. Marshall*, 388 S.W.2d 176, 181 (Tex. 1965)). Parties that enter into easements are certainly capable of writing a fixed width into the easement. *See, e.g.*, *Greenwood v. Lee*, 420 S.W.3d 106, 116 (Tex. App.—Amarillo 2012, pet. denied) (holding that an express easement entitling the easement holder to utilize a forty-five-foot strip of land gave the

grantee "the unrestricted right to use the entire forty-five feet"). That is their prerogative. But as prior cases demonstrate, sometimes parties to an easement account for anticipated developments in technology and demand by not fixing an easement's width. The use of a general easement without a fixed width is a strategic decision that does not render an easement ambiguous or require a court to supply the missing term. *See* RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 4.10 (2000) ("Except as limited by the terms of the servitude determined under § 4.1, the holder of an easement or profit as defined in § 1.2 is entitled to use the servient estate in a manner that is reasonably necessary for the convenient enjoyment of the servitude.").

Because landowners purchase properties aware of any encumbrances, and easements are a common encumbrance, landowners are charged with notice of easements that may encumber their property, including easements that do not contain a specific width but instead include general language. *See Williams v. Thompson*, 256 S.W.2d 399, 403 (Tex. 1953) (discussing that a landowner who purchased a property encumbered by an express easement recorded in the chain of title is charged with notice of the easement). Here, the Landowners purchased their properties long after SWEPCO acquired its express general easements. As a result, the Landowners took these properties with notice that the easements authorized SWEPCO to utilize the land for a number of purposes relating to the transmission line, and that these easements did not specify a width. The Landowners were of course free to renegotiate the easements with SWEPCO, and in fact SWEPCO invited them to do so. But the Landowners did not agree to SWEPCO's proposed fixed width. As a result, the Landowners' properties remain burdened by general easements with no defined width.

20

This does not mean, however, that the Landowners are without recourse as to SWEPCO's future use of the easements. The holder of a general easement must utilize the land in a reasonable manner and only to an extent that is reasonably necessary. *See Severance*, 370 S.W.3d at 721 (citation omitted). Specifically, a general easement includes the implied grant of "reasonable use such as is reasonably necessary and convenient and as little burdensome as possible to the servient owner." *Id.* (citation omitted). This requirement provides a vehicle for the servient land owner to pursue recourse if the grantee utilizes the servient land in an unreasonable or unnecessary manner. SWEPCO itself acknowledges that its utilization of the Landowners' properties is subject to the reasonableness and necessary use requirements. SWEPCO's use of the land is also limited by the express terms of the 1949 easements. *See, e.g.*, *Krohn*, 90 S.W.3d at 701 (citations omitted) ("An easement's express terms, interpreted according to their generally accepted meaning, therefore delineate the purposes for which the easement holder may use the property."). Throughout the transmission line upgrade project during 2014 and 2015, SWEPCO utilized the easements in a way that the Landowners evidently did not perceive to be unreasonable or unnecessary, or violate the easements' express terms. Indeed, the Landowners did not object to SWEPCO's use of the easements to replace the transmission line's wooden poles with modernized, metal poles. Only after the completion of the modernization project did the Landowners bring suit in an attempt to fix SWEPCO's easements to a width of thirty feet. If at some point in the future SWEPCO utilizes the easements in a way that the Landowners believe is unreasonable and not reasonably necessary, or in a way that violates the express terms of the easements, the Landowners could at that point bring suit to enjoin SWEPCO's use of the easements. *See City of Mission v. Popplewell*, 294 S.W.2d 712,

21

714 (Tex. 1956) (explaining that injunction is a proper remedy to challenge an easement holder's use of an easement). Alternatively, the Landowners and SWEPCO could agree to amend the easements to add a fixed width.

## IV. Conclusion

SWEPCO acquired general easements over the Landowners' properties. These easements describe a range of authorized activities and rights granted to SWEPCO for specific purposes relating to a transmission line. The plain language of the easements does not include a fixed width for the easements, nor were the easements required to do so. The court of appeals thus erred in affirming the trial court's creation of a thirty-foot width for the easements. Accordingly, we affirm the court of appeals' judgment as to the trial court's jurisdiction, and we reverse the court of appeals' judgment as to the easements' scope. We render judgment for SWEPCO.

_____
Paul W. Green
Justice

OPINION DELIVERED: February 28, 2020